## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| DIANA NICKERSON, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>     v.<br><br>AMERICAN ELECTRIC POWER COMPANY, INC., NICHOLAS K. AKINS, BRIAN X. TIERNEY, and JOSEPH M. BUONAIUTO,<br><br>     Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Diana Nickerson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, public filings, wire and press releases published by and regarding American Electric Power Company, Inc. ("AEP" or the "Company"), information readily obtainable on the Internet such as media reports about the Company, and filings in the following criminal cases: *USA v. Generation Now*, 1:20-MJ-00522 (S.D. Oh.); *USA v. Cespedes*, 1:20-MJ-00523 (S.D. Oh.); *USA v. Longstreth*, 1:20-MJ-00524 (S.D. Oh.); *USA v. Householder v. Householder*, 1:20-MJ-00525 (S.D. Oh.); *USA v. Borges*, 1:20-MJ-00526 (S.D. Oh.); and *USA v. Clark*, 1:20-MJ-00527 (S.D. Oh.) (together the "Criminal Proceedings"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased publicly traded AEP securities between November 2, 2016 and July 24, 2020, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district and the Company is headquartered in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased AEP securities during the Class Period and was economically damaged thereby.

7. Defendant AEP is an electric public utility holding company which engages in the generation, transmission, and distribution of electricity for sale to retail and wholesale customers in the United States.

8. AEP is incorporated in New York and its principal executive office is located at 1 Riverside Plaza, Columbus, Ohio. AEP's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AEP" and the Company's preferred stock trades on the NYSE under the ticker symbol "AEP-PB."

9. Defendant Nicholas K. Akins ("Akins") has served as the Company's President, Chief Executive Officer, and Chairman during the Class Period.

10. Defendant Brian X. Tierney ("Tierney") has served as the Company's Chief Financial Officer and Executive Vice President during the Class Period.

11. Defendant Joseph M. Buonaiuto ("Buonaiuto") has served as the Company's Controller and Chief Accounting Officer during the Class Period.

12. Defendants Akins, Tierney, and Buonaiuto are collectively referred to herein as the "Individual Defendants."

13. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to AEP under *respondeat superior* and agency principles.

16.     Defendant AEP and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background Information

17.     On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio issued a press release entitled "Ohio House Speaker, former chair of Ohio Republican Party, 3 other individuals & 501(c)(4) entity charged in federal public corruption racketeering conspiracy involving $60 million" which announced the following, in pertinent part, regarding the bribery scheme:

COLUMBUS, Ohio – The Ohio Speaker of the House was arrested this morning and charged in a federal racketeering conspiracy involving approximately $60 million paid to a 501(c)(4) entity to pass and uphold a billion-dollar nuclear plant bailout.

It is alleged that **Larry Householder**, 61, of Glenford, Ohio, and the enterprise conspired to violate the racketeering statute through honest services wire fraud, *receipt of millions of dollars in bribes* and money laundering.

Four other individuals were also arrested and charged. They include:

**Mathew Borges**, 48, of Bexley, a lobbyist who previously served as chair of the Ohio Republican Party;
**Jeffrey Longstreth**, 44, of Columbus, Householder's longtime campaign and political strategist;
**Neil Clark**, 67, of Columbus, a lobbyist who owns and operates Grant Street Consultants and previously served as budget director for the Ohio Republican Caucus; and
**Juan Cespedes**, 40, of Columbus, a multi-client lobbyist.

**Generation Now**, a corporate entity registered as a 501(c)(4) social welfare organization, was also charged.

\*       \*       \*

***According to the 80-page criminal complaint unsealed today, from March 2017 to March 2020, the enterprise received millions of dollars in exchange for Householder's and the enterprise's help in passing House Bill 6, a billion-dollar bailout that saved two failing, Ohio nuclear power plants from closing.***

The defendants then also allegedly worked to corruptly ensure that HB 6 [Ohio House Bill 6] went into effect by defeating a ballot initiative to overturn the legislation. ***The Enterprise received approximately $60 million into Generation Now from an energy company and its affiliates during the relevant period.***

As alleged, in February 2017, Longstreth incorporated Generation Now as a 501(c)(4) social welfare entity purporting to promote energy independence and economic development; however, the entity was secretly controlled by Householder. As Clark stated in a recorded conversation, "*Generation Now is the Speaker's (c)(4).*" ***Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection.***

***In March 2017, Householder began receiving quarterly $250,000 payments from the related-energy companies into the bank account of Generation Now.*** The defendants allegedly spent millions of the company's dollars to support Householder's political bid to become Speaker, to support House candidates they

believed would back Householder, and for their own personal benefit. When asked how much money was in Generation Now, Clark said, "it's unlimited."

The affidavit filed in support of the criminal complaint also alleges:

In 2018, the enterprise spent energy company-to-Generation Now money on approximately 21 different state candidates – 15 (including Householder) in the primary, and six additional candidates in the general election. The Enterprise spent more than one million in fall 2018 alone to flood the airways with negative ads against enterprise opponents. Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker.

Money passed from the energy company through Generation Now was used to pay for Householder campaign staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.

Householder received more than $400,000 in personal benefits as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt.

The enterprise paid $15,000 to an individual to provide insider information about the ballot initiative and offered to pay signature collectors for the ballot initiative $2,500 cash and plane fare to stop gathering signatures.

*   *   *

"It takes courage for citizens to assist law enforcement in the ways detailed in the affidavit," U.S. Attorney David M. DeVillers said. "We are grateful to those who felt a moral duty to work together with agents in bringing to light this alleged, significant public corruption."

"All forms of public corruption are unacceptable," stated FBI Cincinnati Special Agent in Charge Chris Hoffman. "***When the corruption is alleged to reach some of the highest levels of our state government, the citizens of Ohio should be shocked and appalled***."

(Emphasis added.)

18.    The criminal complaints and affidavits were filed that same day in the Criminal Proceedings. These documents detailed a brazen scheme by Ohio-based energy companies to corrupt the political process and undermine democratic institutions in the State of Ohio in order to secure passage of Ohio House Bill 6 ("HB6"). The allegations contained in the criminal complaints

6

and affidavits were supported by detailed transcripts of phone calls, recorded conversations, text messages, bank records and contemporaneous documentary evidence.

**Overview of the Corruption Scheme**

19.     In January 2017, then-former Ohio House Speaker Larry Householder met with representatives from another Ohio-based energy company during a flight on one of the its jets. After more than a decade, Householder had won back his old Ohio House seat in 2016 and was eager to re-ascend to his former Speakership. During or around the time of the flight, a corrupt bargain was struck between Householder and major players in the Ohio energy industry which sent millions of dollars in payments to Householder for his personal enrichment and to support his bid for Speakership. In exchange, Householder promised to secure the passage of legislation that would provide benefits to Ohio energy companies, including AEP.

20.     In February 2017, the corrupt conspiracy between his affiliates went into motion in earnest with the establishment of "Generation Now" and "Energy Pass-Through," 501(c)(4) organizations used to funnel dark money from Ohio energy companies to Householder and his affiliates. In all, more than $60 million was paid to Householder and his operatives in furtherance of the bribery scheme. As one of the alleged co-conspirators, lobbyist Neil Clark (characterized in the criminal complaint as Householder's political "hit man") stated in a secretly recorded conversation: "Nobody knows the money goes to the Speaker's account . . . it's not recorded."

21.     The clandestine payments were used to fund the political campaigns of over 20 state legislative candidates. The enterprise managed these candidates' campaigns, paid their staffs, and designed and paid for mailers and commercials. Most of these candidates won their elections. All who won voted for Householder as Speaker and all but two ultimately voted for HB6 despite

its unpopularity. In addition, Householder used a portion of the funds to enrich himself personally, including to buy a home in Florida and to settle a personal lawsuit against him.

22.     The day Householder was elected Speaker he quickly moved to uphold his end of the bargain by pledging to create a standing subcommittee on energy generation. Householder followed through shortly thereafter, securing the votes for HB6 and defending the bill against a citizens' ballot initiative. HB6 includes a provision for the recovery of Ohio Valley Electric Corporation ("OVEC"), which is approximately 43% owned by AEP, costs through 2030. HB6 also includes provisions cutting Ohio renewable energy standards and cutting Ohio energy efficiency standards – both benefiting AEP as well.

23.     Ohio energy companies including FirstEnergy Corp., FirstEnergy Solutions Corp. (now Energy Harbor Corp.), and AEP greased the bill's passage by funneling millions of dollars through dark money political groups. These groups in turn paid for a massive media campaign in support of HB6 while concealing the energy companies' involvement. The massive media blitz was used to sway public opinion, often through highly misleading ads, and provide cover for politicians to vote in favor of the unpopular bill. Householder also personally pressured lawmakers to support the bill, threatening those who opposed him and developing a "hyper local" "Senator-by-Senator game plan" to get the votes necessary to secure passage.

24.     There was only a short time between when Householder became Speaker in January 2019 and HB6 was signed into law in July 2019. At the same time that the conspiracy was receiving millions of dollars from Ohio energy companies it was taking overt steps to put the plans to corrupt the legislative process into action.

25.     These illicit activities achieved their aim, and, in July 2019, HB6 passed and was signed into law. Almost immediately, public opposition began to mount and citizen groups worked to get on the ballot a voter referendum to repeal the law.

26.     The enterprise went into overdrive to thwart this initiative, secretly funding yet another round of highly misleading political advertisements through its dark money network. At least $38 million was wired through Generation Now, Inc. ("Generation Now") into a front company that paid for a media blitz of commercials and fliers orchestrated by the illicit enterprise. These advertisements were intended to stoke fear among Ohio citizens by falsely claiming that China was using the petition drive to invade Ohio's energy grid. The following examples are typical of the underhanded campaign:





27.     The scheme went further, hiring top signature collection firms in order to prevent them from working on the ballot initiative by creating a conflict of interest. Energy company-funded Generation Now paid at least 15 such firms not to work. The enterprise also bribed an employee of the citizens' ballot initiative for inside information that could be used against the campaign. The transaction was implemented by Matthew Borges, then a lobbyist, who was also the former Chairman of the Ohio Republican Party, and current criminal defendant in the Criminal Proceedings. Other operatives bribed signature collectors in order to subvert the ballot campaign's efforts. In the end, the energy companies' massive resources and unscrupulous tactics successfully prevented the referendum from gathering the requisite signatures and HB6 remained in effect.

28.     The illicit nature of these activities was understood. As one of the criminal defendants, another industry lobbyist, stated on a secretly recorded line, "everybody knows [Householder is] pay to play." For a time, the Company was able to conceal its misdeeds from the public and the market, successfully inflating the price of its securities.

**Materially False and Misleading**

**Statements Issued During the Class Period**

29. On November 2, 2016, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2016 (the "3Q 16 10-Q") which was signed by Defendant Buonaiuto. Attached to the 3Q 16 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

30. The 3Q 16 10-Q stated the following, in pertinent part, regarding the Company's regulatory and legislative outlook and efforts:

> In September 2016, due to AEP's ongoing evaluation of strategic alternatives for its merchant generation assets, declining forecasts of future energy and capacity prices, and a ***decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio providing for the recovery of AEP's existing Ohio merchant generation assets***, AEP performed an impairment analysis at the unit level on the remaining merchant generation assets in accordance with accounting guidance for impairments of long-lived assets. The evaluation was performed using generating unit specific estimated future cash flows and resulted in a material impairment of certain merchant generation fleet assets. ***As a result, AEP recorded a pretax impairment of $2.3 billion ($1.5 billion, net of tax) in Asset Impairments and Other Related Charges on the statement of operations related to 2,684 MWs of Ohio merchant generation*** including Cardinal Unit 1, 43.5% ownership interest in Conesville Unit 4, Conesville Units 5-6, 26.0% ownership interest in Stuart Units 1-4, and 25.4% ownership interest in Zimmer Unit 1, as well as Putnam coal and I&M's Price River coal reserves, Desert Sky and Trent Wind Farms and the merchant generation portion of the Oklaunion Plant. As of September 30, 2016, the remaining net book value of these assets is $50 million. See "Merchant Generating Assets (Generation & Marketing Segment)" section of Note 6 for additional information.
>
> Management continues to evaluate potential alternatives for the remaining merchant generation assets. ***These potential alternatives may include, but are not limited to, propose restructuring of Ohio electricity regulations*** to allow certain of these assets to be acquired by OPCo [Ohio Power Company, an AEP electric utility subsidiary] for the benefit of its customers, transfer or sale of AEP's ownership interests, or a wind down of merchant coal-fired generation fleet operations. . . .

11

*      *      *

Federal and state legislation or regulations that mandate limits on the emission of $CO_2$ could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs. ***Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities and could lead to possible impairment of assets.***

(Emphasis added.)

31.     On February 28, 2017, AEP filed its yearly report on Form 10-K with the SEC for the year ended December 31, 2016 (the "2016 Annual Report") which was signed by Defendants Akins, Tierney, and Buonaiuto. Attached to the 2016 Annual Report were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

32.     The 2016 Annual Report stated the following, in pertinent part, regarding the regulations and Company's legislative outlook and efforts:

> ***AEP's vertically integrated public utility subsidiaries' retail rates and certain other matters are subject to traditional cost-based regulation by the state utility commissions.*** AEP's vertically integrated public utility subsidiaries are also subject to regulation by the FERC [Federal Energy Regulatory Commission] under the Federal Power Act with respect to wholesale power and transmission service transactions. . . . AEP and its vertically integrated public utility subsidiaries are also subject to the regulatory provisions of EPACT [The Energy Policy Act of 2005], much of which is administered by the FERC.
>
> ***Rates***
>
> Historically, state utility commissions have established electric service rates on a cost-of-service basis, which is designed to allow a utility an opportunity to recover its cost of providing service and to earn a reasonable return on its investment used in providing that service. A utility's cost of service generally reflects its operating expenses, including operation and maintenance expense, depreciation expense and taxes. State utility commissions periodically adjust rates pursuant to a review of (a) a utility's adjusted revenues and expenses during a defined test period and (b) such utility's level of investment. Absent a legal limitation, such as a law limiting the frequency of rate changes or capping rates for a period of time, a state utility commission can review and change rates on its own initiative. Some states may

initiate reviews at the request of a utility, customer, governmental or other representative of a group of customers. Such parties may, however, agree with one another not to request reviews of or changes to rates for a specified period of time.

Public utilities have traditionally financed capital investments until the new asset is placed in service. Provided the asset was found to be a prudent investment, it was then added to rate base and entitled to a return through rate recovery. Given long lead times in construction, the high costs of plant and equipment and volatile capital markets, management is actively pursuing strategies to accelerate rate recognition of investments and cash flow. ***AEP representatives continue to engage state commissioners and legislators on alternative ratemaking options to reduce regulatory lag and enhance certainty in the process. These options include pre-approvals, a return on construction work in progress, rider/trackers, formula rates and the inclusion of future test-year projections into rates.***

The rates of AEP's vertically integrated public utility subsidiaries are generally based on the cost of providing traditional bundled electric service (i.e., generation, transmission and distribution service). Historically, the state regulatory frameworks in the service area of the AEP vertically integrated public utility subsidiaries reflected specified fuel costs as part of bundled (or, more recently, unbundled) rates or incorporated fuel adjustment clauses in a utility's rates and tariffs. Fuel adjustment clauses permit periodic adjustments to fuel cost recovery from customers and therefore provide protection against exposure to fuel cost changes.

*     *     *

***Technology advancements, increased demand for clean energy, changing consumer behaviors, low-priced and abundant natural gas, and regulatory and public policy reforms are among the catalysts for transformation within the industry that impact competition for AEP's vertically integrated public utility subsidiaries.*** AEP's vertically integrated public utility subsidiaries also compete with self-generation and with distributors of other energy sources, such as natural gas, fuel oil, renewables and coal, within their service areas. The primary factors in such competition are price, reliability of service and the capability of customers to utilize alternative sources of energy other than electric power. With respect to competing generators and self-generation, the public utility subsidiaries of AEP believe that they currently maintain a competitive position.

Changes in regulatory policies and advances in newer technologies for batteries or energy storage, fuel cells, microturbines, wind turbines and photovoltaic solar cells are reducing costs of new technology to levels that are making them competitive with some central station electricity production. . . .

AEP typically recovers undepreciated plant balances and associated operating costs, each including a return, from customers through regulated rates in regulated

13

jurisdictions. Failure to recover these costs could reduce future net income and cash flows and possibly harm financial condition.

Recent changes in the global economy have led to increased competition for many industrial customers in the United States, including those served by the AEP System. Industrial customers that are downsizing or reorganizing often close a facility based upon its costs, which may include, among other things, the cost of electric power. The vertically integrated public utility subsidiaries of AEP work with such customers to meet their business needs. For example, various off-peak or interruptible supply options may be provided pursuant to tariffs filed with, and approved by, the various state commissions. ***The vertically integrated public utility subsidiaries of AEP also work with customers that seek to source more of their electric power from renewable resources.*** Depending on the jurisdiction, customers may have access to green power tariffs. In other instances, AEP purchases renewable power that is available to all customers in a specific jurisdiction.

(Emphasis added.)

33.     On April 28, 2017, AEP filed its quarterly report on Form 10-Q with the SEC for

the period ended March 31, 2017 (the "1Q 17 10-Q") which was signed by Defendant Buonaiuto.

Attached to the 1Q 17 10-Q were certifications pursuant to SOX signed by Defendants Akins and

Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

34.     The 1Q 17 10-Q stated the following, in pertinent part, regarding the Company's

regulatory and legislative outlook and efforts:

***Climate Change, CO2 Regulation and Energy Policy***

The majority of the states where AEP has generating facilities passed legislation establishing renewable energy, alternative energy and/or energy efficiency requirements that can assist in reducing carbon emissions. ***Management is taking steps to comply with these requirements, including increasing wind and solar installations and power purchases and broadening the AEP System's portfolio of energy efficiency programs.***

*            *            *

Federal and state legislation or regulations that mandate limits on the emission of $CO_2$ could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs. Excessive costs to comply with future legislation or regulations might force

AEP to close some coal-fired facilities and could lead to possible impairment of assets.

\*      \*      \*

*In September 2016, due to AEP's ongoing evaluation of strategic alternatives for its merchant generation assets, declining forecasts of future energy and capacity prices, and a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio providing for the recovery of AEP's existing Ohio merchant generation assets*, AEP performed an impairment analysis at the unit level on the remaining merchant generation assets in accordance with accounting guidance for impairments of long-lived assets.

(Emphasis added.)

35.    On May 25, 2017, AEP released its 2017 Corporate Accountability Report, which stated the following, in pertinent part, regarding the Company's clean energy strategy, and its regulatory and legislative outlook and efforts:

**Carbon and Climate**

AEP's carbon footprint has been dramatically reduced in recent years. In 2017, we estimate that our carbon emissions will be 56 percent below 2000 levels. In addition to new renewable sources, the sale of merchant generation, previous coal unit retirements and economic factors such as lower natural gas prices, all contributed to this decline.

*Carbon and climate change continue to take center stage in discussions with many of our stakeholders. Investors and environmental groups ask us about how we will continue to transition to a less-carbon-intensive energy future, and customers want more access to renewable resources to meet their own clean energy objectives.*

Our path forward is clear. We do not foresee adding new coal. However, our remaining fossil and nuclear units provide critical 24/7 power to the grid and a resilient source of power for all customers. We need these resources to ensure a continued balanced portfolio of resources.

Regardless of the political environment and the fate of the Clean Power Plan or other changes that may be in the works, *AEP remains committed to a clean energy future because that is what our customers and stakeholders expect. We have always maintained that any approach to climate change should be economy-wide and addressed through legislative policy.* That said, the U.S. Supreme Court has ruled that the U.S. Environmental Protection Agency can regulate carbon, so we

are preparing for that prospect. Our planning criteria includes a proxy cost of carbon when developing all of our resource plans to prepare for that eventuality.

***We will continue to engage with all of our stakeholders on carbon and climate change and to be transparent about our plans.***

\* \* \*

**Lobbying and Political Contributions**

The electric utility industry is undergoing a fundamental transformation driven by a number of factors, including new regulations and public policies. For the benefit of all stakeholders, we actively participate in the political process and in lobbying activities at the national, state and local levels.

The investments needed to modernize the power grid are in the billions of dollars, and the stakes have never been higher. ***To understand the policies and regulations that could affect our business, we participate in a number of organizations, lobby on our customers' behalf and contribute to political candidates.***

***Each year, AEP publicly discloses lobbying activities and political contributions.*** We also annually report on the portions of membership dues from organizations such as the Business Roundtable (BRT) and Edison Electric Institute (EEI) that go toward lobbying. We post our lobbying policy online and we have a process in place to review political contributions annually with AEP's Board of Director's Committee on Directors and Corporate Governance.

(Emphasis added.)

36. On July 27, 2017, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017 (the "2Q 17 10-Q") which was signed by Defendant Buonaiuto. Attached to the 2Q 17 10-Q were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

37. The 2Q 17 10-Q stated the following, in pertinent part, regarding the Company's regulatory and legislative outlook and efforts:

Federal and state legislation or regulations that mandate limits on the emission of $CO_2$ could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs. Excessive costs to comply with future legislation or regulations might force

AEP to close some coal-fired facilities and could lead to possible impairment of assets.

*     *     *

In September 2016, due to AEP's ongoing evaluation of strategic alternatives for its merchant generation assets, declining forecasts of future energy and capacity prices, and a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio providing for the recovery of AEP's existing Ohio merchant generation assets, AEP performed an impairment analysis at the unit level on the remaining merchant generation assets in accordance with accounting guidance for impairments of long-lived assets.

38. On October 27, 2017, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2017 (the "3Q 17 10-Q") which was signed by Defendant Buonaiuto. Attached to the 3Q 17 10-Q were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

39. The 3Q 17 10-Q stated the following, in pertinent part, regarding the Company's clean energy strategy, and also its regulatory and legislative outlook and efforts:

The majority of the states where AEP has generating facilities passed legislation establishing renewable energy, alternative energy and/or energy efficiency requirements that can assist in reducing carbon emissions. ***Management is taking steps to comply with these requirements, including increasing wind and solar installations and power purchases and broadening the AEP System's portfolio of energy efficiency programs.***

*     *     *

The Federal EPA has re-examined its legal interpretation of the "best system of emission reduction" and found that based on the statutory text, legislative history, use of similar terms elsewhere in the CAA and its own historic implementation of Section 111 that a narrower interpretation of the term limits it to those designs, processes, control technologies and other systems that can be applied directly to or at the source. Since the primary systems relied on in the CPP are not consistent with that interpretation, the Federal EPA proposes that the rule be withdrawn. ***Management does not expect a change in AEP's overall strategy as a result of the proposed repeal.***

17

Federal and state legislation or regulations that mandate limits on the emission of $CO_2$ could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs. Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities and could lead to possible impairment of assets.

*     *     *

In September 2016, due to AEP's ongoing evaluation of strategic alternatives for its merchant generation assets, declining forecasts of future energy and capacity prices, and a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio providing for the recovery of AEP's existing Ohio merchant generation assets, AEP performed an impairment analysis at the unit level on the remaining merchant generation assets in accordance with accounting guidance for impairments of long-lived assets. Based on the impairment analysis performed in the third quarter of 2016, AEP recorded a pretax impairment of $2.3 billion in Asset Impairments and Other Related Charges on the statement of operations.

(Emphasis added.)

40. On February 6, 2018, AEP issued a press release entitled "AEP's Clean Energy Strategy Will Achieve Significant Future Carbon Dioxide Reductions" which touted the Company's strategy towards cleaner energy, quoting Defendant Akins:

"AEP is focused on modernizing the power grid, expanding renewable energy resources and delivering cost-effective, reliable energy to our customers," said Nicholas K. Akins, AEP chairman, president and chief executive officer. "Our customers want us to partner with them to provide cleaner energy and new technologies, while continuing to provide reliable, affordable energy. Our investors want us to protect their investment in our company, deliver attractive returns and manage climate-related risk. This long-term strategy allows us to do both."

41. On February 23, 2018, AEP filed its yearly report on Form 10-K with the SEC for the year ended December 31, 2017 (the "2017 Annual Report") which was signed by Defendants Akins, Tierney, and Buonaiuto. Attached to the 2017 Annual Report were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

42.     The 2017 Annual Report stated the following, in pertinent part, regarding the regulations and Company's legislative outlook and efforts:

***Corporate Governance***

***In response to environmental issues and in connection with its assessment of AEP's strategic plan, the Board of Directors continually reviews the risks posed by new environmental rules and requirements that could accelerate the retirement of coal-fired generation assets. The Board of Directors is informed of any new environmental regulations and proposed regulation or legislation that would affect the company. The Board's Committee on Directors and Corporate Governance oversees the company's annual Corporate Accountability Report, which includes information about the company's environmental, financial and social performance.*** In addition, as a result of ongoing corporate governance outreach efforts with shareholders, AEP set new carbon dioxide emission reduction goals that were published in a new report in February 2018, "American Electric Power: Strategic Vision for a Clean Energy Future."

\*       \*       \*

In the event that alternative generation resources are mandated, subsidized or encouraged through climate legislation or regulation or otherwise are economically competitive and added to the available generation supply, such resources could displace a higher marginal cost fossil plant, which could reduce the price at which market participants sell their electricity. These events could cause AGR to retire generating capacity prior to the end of its estimated useful life.

\*       \*       \*

**Lobbying and Political Contributions**

. . . The investments needed to modernize the power grid are in the billions of dollars, and the stakes have never been higher. To understand the policies and regulations that could affect our business, ***we participate in a number of organizations, lobby on our customers' behalf and contribute to political candidates.***

***Each year, AEP publicly discloses lobbying activities and political contributions.*** We also annually report on the portions of membership dues paid to organizations such as the U.S. Chamber of Commerce and Edison Electric Institute (EEI) that go toward lobbying. We post our lobbying policy online and we discuss political contributions annually with AEP's Board of Director's Committee on Directors and Corporate Governance.

. . . In general, we believe it is better to be at the table and engaged in the discussion whether we are in total agreement or not. When we disagree, we voice our concerns and work to change the position. Sometimes we prevail, and sometimes we do not, but *we strive to reach an appropriate position, based on the facts available. In addition, many of our customers belong to these organizations, and this helps us better understand their concerns and needs.*

*We believe in transparency and active participation in public debate. Our experience is that open, candid discussion and a good-faith attempt to reach common ground is the best way to do business.*

(Emphasis added.)

43.     On April 26, 2018, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 (the "1Q 18 10-Q") which was signed by Defendant Buonaiuto. Attached to the 1Q 18 10-Q were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

44.     The 1Q 18 10-Q stated the following, in pertinent part, regarding the Company's regulatory and legislative outlook and efforts:

*Climate Change, CO2 Regulation and Energy Policy*

The majority of the states where AEP has generating facilities passed legislation establishing renewable energy, alternative energy and/or energy efficiency requirements that can assist in reducing carbon emissions. Management is taking steps to comply with these requirements, including increasing wind and solar installations and power purchases and broadening the AEP System's portfolio of energy efficiency programs.

\*     \*     \*

Federal and state legislation or regulations that mandate limits on the emission of CO2 could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs. Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities and could lead to possible impairment of assets.

45.     On May 3, 2018, AEP released its 2018 Corporate Accountability Report, which stated the following, in pertinent part, regarding the Company's customer focus, clean energy strategy, and also its regulatory and legislative outlook and efforts:

**Putting Customers First**

*We deeply value the relationships we have with our customers and communities.* As fast as technology changes and the demand for flexibility of the power grid grows, our customers' expectations are also evolving. We want to collaborate with them to deliver energy solutions and provide service that goes beyond their expectations. Today, we're taking steps to ensure every customer has a great experience whenever, and however, they interact with AEP. . . .

*In 2018, we are building a new, state-of-the-art Social Media Center to enhance and expand our ability to listen to and engage with customers and key stakeholders.* Customers want to use digital channels to access information or buy services. We will pilot a new energy usage program via a digital platform. We are providing additional training to our customer operations representatives so they can provide an exceptional experience to every customer, every time. . . .

We believe that regulators must ensure that these new technologies are provided to all. AEP is at the forefront of developing a truly sustainable, inclusive energy future that recognizes the unique needs of all customers and leaves no one behind. *We will continue to advance new and innovative energy solutions, working with our customers, regulators and legislators to make the changes to support a modern and resilient grid.*

\*       \*       \*

**Regulatory and Public Policy**

. . . In 11 states, AEP operates within a variety of jurisdictional regulatory frameworks. Those frameworks primarily are governed by state legislatures that direct state regulatory commissions to achieve overarching policy goals. These regulatory and legislative environments, in conjunction with federal regulation and legislation, define the parameters of AEP's business and planning models.

Our focus always is on a safe and reliable grid that is resilient and adaptive. *Our generation, transmission and distribution system investments directly affect our customers and shareholders. These investments must coexist with regulation and policy considerations such as environmental rules and affordability.* As we transition to a clean energy future, we are reshaping our asset base in a reliable and affordable manner for our customers while managing the financial risk for our

shareholders. The changes we are making must be compatible with the regulatory frameworks in which we exist on the wires (transmission and distribution) side of the business.

***However, regulatory frameworks must be responsive to today's technology and customer preference environment.*** AEP is at the forefront of evaluating and deploying technologies to improve the customer experience. ***Regulations must be progressive enough to allow the utility to provide these solutions for customers. The customer must be the center of our focus and analysis and regulatory policy decision-making.***

\*       \*       \*

**Public Policy and Issue Management**

Similar to other companies, AEP has a public policy strategy that seeks to influence decisions being made at Congress, FERC, state legislatures and regulatory commissions. ***We do this to mitigate our risk exposure and to help us achieve our business objectives.***

In 2017, AEP formed the Policy Advisory Team (PAT) to better manage public policy issues. This team is composed of senior executives across AEP, including some of those who represent the company in Washington, D.C., and the state capitals in our service territory.

The PAT considers policy options on issues of relevance to the company. The multi-departmental, cross-function structure of the PAT supports internal policy analysis and debate. ***The approach helps ensure that AEP is speaking with one voice on important public policy considerations and that all employees, and ultimately external stakeholders, are clear on our policy positions and objectives. The goal of the PAT is to ensure a smoother, more consistent policy strategy across the company.***

In strategic discussions about how we can best align ourselves to maximize the customer benefits of new technologies, we talk about "future-proofing" our company. The pace and scope of change underway in the utility sector is indisputable. In order to adapt and bring the most value to customers, utilities require a regulatory and legislative framework that allows them the flexibility to incorporate new technologies, including those we've not even envisioned yet. ***We need a regulatory paradigm that fosters rapid deployment of creative energy solutions.*** . . .

***But we also have to ask ourselves: "What about the customer? Do they have to wait longer for a solution? What do they do in the meantime?" We must center our decisions and timing on a framework that works for all customers.***

> *. . . In 2017, the Public Utilities Commission of Ohio (PUCO) launched an initiative called PowerForward to study grid modernization in the state. The PUCO is focusing on new technologies and regulatory innovation that could benefit customers in the future while modernizing the grid. Through this process, the PUCO has acknowledged customers' desire for more technology and innovation in the electric sector, along with the need for a modern regulatory road map to make it happen.* This is the type of structured stakeholder conversation that is needed to enable the paradigm shift to occur.

(Emphasis added.)

46. On July 26, 2018, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2Q 18 10-Q") which was signed by Defendant Buonaiuto. Attached to the 2Q 18 10-Q were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

47. The 2Q 18 10-Q stated the following, in pertinent part, regarding the Company's clean energy strategy and its regulatory and legislative outlook and efforts:

> AEP has taken action to reduce and offset $CO_2$ emissions from its generating fleet and expects $CO_2$ emissions from its operations to continue to decline due to the retirement of some of its coal-fired generation units, and actions taken to diversify the generation fleet and increase energy efficiency where there is regulatory support for such activities. The majority of the states where AEP has generating facilities passed legislation establishing renewable energy, alternative energy and/or energy efficiency requirements that can assist in reducing carbon emissions. Management is taking steps to comply with these requirements, including increasing wind and solar installations, power purchases and broadening AEP System's portfolio of energy efficiency programs.

*     *     *

> Federal and state legislation or regulations that mandate limits on the emission of $CO_2$ could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs. Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities, which could possibly lead to impairment of assets.

48. On October 25, 2018, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018 (the "3Q 18 10-Q") which was signed by Defendant

Buonaiuto. Attached to the 3Q 18 10-Q were certifications pursuant to SOX signed by Defendants

Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all

fraud.

49.     The 3Q 18 10-Q stated the following, in pertinent part, regarding the Company's

clean energy strategy and its regulatory and legislative outlook and efforts:

> AEP has taken action to reduce and offset $CO_2$ emissions from its generating fleet
> and expects $CO_2$ emissions from its operations to continue to decline due to the
> retirement of some of its coal-fired generation units, and actions taken to diversify
> the generation fleet and increase energy efficiency where there is regulatory support
> for such activities. The majority of the states where AEP has generating facilities
> passed legislation establishing renewable energy, alternative energy and/or energy
> efficiency requirements that can assist in reducing carbon emissions.  Management
> is taking steps to comply with these requirements, including increasing wind and
> solar installations, power purchases and broadening AEP System's portfolio of
> energy efficiency programs.
>
> In February 2018, AEP announced new intermediate and long-term $CO_2$ emission
> reduction goals, based on the output of the company's integrated resource plans,
> which take into account economics, customer demand, grid reliability and
> resiliency, regulations and the company's current business strategy. The
> intermediate goal is a 60% reduction from 2000 $CO_2$ emission levels from AEP
> generating facilities by 2030; the long-term goal is an 80% reduction of $CO_2$
> emissions from AEP generating facilities from 2000 levels by 2050. AEP's total
> projected $CO_2$ emissions in 2018 are approximately 90 million metric tons, a 46%
> reduction from AEP's 2000 $CO_2$ emissions of approximately 167 million metric
> tons.
>
> Federal and state legislation or regulations that mandate limits on the emission of
> $CO_2$ could result in significant increases in capital expenditures and operating
> costs, which in turn, could lead to increased liquidity needs and higher financing
> costs.  Excessive costs to comply with future legislation or regulations might force
> AEP to close some coal-fired facilities, which could possibly lead to impairment of
> assets.

50.     On December 5, 2018, AEP issued a press release entitled "AEP Announces

Executive Leadership Changes" which touted the Company's strategy towards cleaner energy,

quoting Defendant Akins: "With these changes, we will fully leverage the operational expertise,

strong leadership abilities and deep industry knowledge of these key leaders *as we continue our*

*long-term strategy of investment in smart, cleaner energy infrastructure and innovative technological solutions for the benefit of our customers*." (Emphasis added.)

51.     On February 21, 2019, AEP filed its yearly report on Form 10-K with the SEC for the year ended December 31, 2018 (the "2018 Annual Report") which was signed by Defendants Akins, Tierney, and Buonaiuto. Attached to the 2018 Annual Report were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

52.     The 2018 Annual Report stated the following, in pertinent part, regarding the regulations and Company's legislative outlook and efforts:

**Corporate Governance**

In response to environmental issues and in connection with its assessment of AEP's strategic plan, the Board of Directors continually reviews the risks posed by new environmental rules and requirements that could accelerate the retirement of coal-fired generation assets. The Board of Directors is informed of any new environmental regulations and proposed regulation or legislation that would significantly affect the company.  The Board's Committee on Directors and Corporate Governance oversees the company's annual Corporate Accountability Report, which includes information about the company's environmental, social, governance and financial performance. In addition, as a result of ongoing corporate governance outreach efforts with shareholders, AEP set new $CO_2$ emission reduction goals that were published in a new report in February 2018, "American Electric Power: Strategic Vision for a Clean Energy Future."

*          *          *

Public utilities have traditionally financed capital investments until the new asset is placed in service.  Provided the asset was found to be a prudent investment, it was then added to rate base and entitled to a return through rate recovery.  Given long lead times in construction, the high costs of plant and equipment and volatile capital markets, management actively pursues strategies to accelerate rate recognition of investments and cash flow.   AEP representatives continue to engage state commissioners and legislators on alternative ratemaking options to reduce regulatory lag and enhance certainty in the process.  These options include pre-approvals, a return on construction work in progress, rider/trackers, formula rates and the inclusion of future test-year projections into rates.

\*     \*     \*

In the event that alternative generation resources are mandated, subsidized or encouraged through climate legislation or regulation or otherwise are economically competitive and added to the available generation supply, such resources could displace a higher marginal cost fossil plant, which could reduce the price at which market participants sell their electricity. These events could cause AGR to retire generating capacity prior to the end of its estimated useful life.

53. On April 23, 2019, AEP issued a press release entitled "AEP Investing To Deliver Smarter, Cleaner Energy To Customers, Shareholders Learn At Annual Meeting" which touted the Company's focus on cleaner energy, quoting Defendant Akins:

"AEP continually delivers strong earnings and dividend growth driven by our investments in a smarter, cleaner energy system," Akins said. "Beyond our capital investments, our employees and their commitment to the customers and communities we serve drives the success of our company. Our talented workforce is focused on providing reliable, affordable and cleaner energy and new technologies to meet our customers' needs and expectations," Akins said.

54. On April 26, 2019, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "1Q 19 10-Q") which was signed by Defendant Buonaiuto. Attached to the 1Q 19 10-Q were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

55. The 1Q 19 10-Q stated the following regarding HB6:

The Ohio House of Representatives introduced a clean energy bill in April 2019, which would offer incentives for power-generating facilities with zero- or reduced carbon emissions. The Ohio bill also proposes to eliminate the current energy efficiency and renewable mandates for Ohio electric utilities in order to pay for the zero/reduced emission credits. Management is analyzing the impact of this new legislation but it could be significantly amended before passage and cannot, at this time, estimate the impact results on operations, cash flows or financial condition.

56. On May 9, 2019, AEP issued a press release entitled "AEP Releases 2019 Corporate Accountability Report" which touted the Company's focus on its customers and clean energy stating in pertinent part:

26

*The report's theme, "Innovating for a Boundless Energy Future," mirrors AEP's efforts to embrace technology and digitization to deliver clean, reliable energy to its customers and value to its shareholders, while also being a positive force in the communities it serves.*

"At AEP, we see a future full of opportunities for our customers, employees, investors, communities and our company. ***To create this future, we must be increasingly innovative to develop cutting-edge solutions to complex problems. We must be agile and adaptable to leverage rapid, sometimes unpredictable, changes in technology.*** And we must nurture a diverse and engaged workforce that is clearly focused on delivering 21st century customer service as we further electrify our economy," said Nicholas K. Akins, AEP chairman, president and chief executive officer, in the report's introduction.

*Four key principles of the company's sustainable development strategy – being a catalyst for change; supporting environmental stewardship; supporting strong local communities; and building a brighter energy future together with its customers* – guide AEP as the company creates benchmarks and goals.

(Emphasis added.)

57. Also, on May 9, 2019, AEP released its 2019 Corporate Accountability Report, which stated the following, in pertinent part, regarding the Company's regulatory and legislative outlook and efforts:

**Lobbying and Political Contributions**

. . . The investments needed to modernize the power grid are in the billions of dollars, and the stakes have never been higher. ***To understand the policies and regulations that could affect our business, we participate in a number of organizations, lobby on our customers' behalf and contribute to political candidates, where allowed by law.***

***Each year, AEP publicly discloses lobbying activities and political contributions.*** We also annually report on the portions of membership dues paid to organizations such as the U.S. Chamber of Commerce and Edison Electric Institute (EEI) that go toward lobbying. We post our lobbying policy online and we discuss political contributions annually with AEP's Board of Directors' Committee on Directors and Corporate Governance. . . .

***We believe in transparency and active participation in public debate. Our experience is that open, candid discussion and a good-faith attempt to reach common ground is the best way to do business.***

(Emphasis added.)

58.     On July 25, 2019, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q 19 10-Q") which was signed by Defendant Buonaiuto. Attached to the 2Q 19 10-Q were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

59.     The 2Q 19 10-Q stated the following regarding HB6:

In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero- or reduced carbon emissions was signed into law by the Ohio Governor.  The clean energy legislation phases out current energy efficiency and renewable mandates after 2020 and 2026, respectively.  The bill also provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032 and includes a provision for recovery of certain legacy generation resources which will be allocated to all electric distribution utilities on a non-bypassable basis.  Management is analyzing the impact of this legislation and at this time cannot estimate the impact on results of operations, cash flows or financial condition.

60.     On September 10, 2019, AEP issued a press release entitled "AEP Accelerates Carbon Dioxide Emissions Reduction Target" which touted the Company's strategy on cleaner energy stating:

COLUMBUS, Ohio, Sept. 10, 2019 - *American Electric Power (NYSE: AEP) is cutting carbon dioxide emissions faster than anticipated and has revised its 2030 reduction target to 70 percent from 2000 levels.* The company's previous target was a 60 percent reduction from 2000 levels by 2030.

*AEP also is confident that it will cut carbon dioxide emissions by more than 80 percent from 2000 levels by 2050.*

"*AEP's overall strategy is focused on modernizing the power grid, expanding renewable energy resources and delivering reliable energy to our customers. Our transition to a cleaner, more balanced resource mix helps mitigate risk for our customers and shareholders alike and will ensure a more resilient and reliable energy system into the future*," said Nicholas K. Akins, AEP chairman, president and chief executive officer.

"We've made significant progress in reducing carbon dioxide emissions from our power generation fleet and expect our emissions to continue to decline. *Our*

***aspirational emissions goal is zero emissions by 2050.*** Technological advances, including energy storage, will determine how quickly we can achieve zero emissions while continuing to provide reliable, affordable power for customers," Akins said.

AEP will achieve future carbon dioxide emissions reductions through a variety of actions including investments in renewable generation, investments in transmission and distribution technologies to enhance efficiency, and expanded demand response and energy efficiency programs.

AEP's resource plans include adding more than 8,600 megawatts (MW) of new wind and solar generation to serve the company's regulated utility customers by 2030. . . .

AEP also is investing in renewable energy in competitive markets. Between 2019 and 2023, the company plans to invest approximately $2.2 billion in contracted renewables and renewables integrated with energy storage. AEP already added 1,302 megawatts of contracted renewables to its portfolio this year.

***To enhance the efficiency and resiliency of the energy delivery system, AEP's long-term strategy includes plans to invest approximately $25 billion over the next 5 years in its transmission and distribution systems.***

AEP has factored future carbon regulations into the company's evaluation of generation resource options for many years and will continue to do so. The company already has cut its carbon dioxide emissions by 59 percent since 2000.

***AEP's generation capacity has gone from 70 percent coal-fueled in 2005 to 45 percent today.*** Its natural gas capacity increased from 19 percent in 2005 to 28 percent today, and its renewable generation capacity has increased from 4 percent in 2005 to 17 percent today.

(Emphasis added.)

61.    On September 16, 2019, AEP published a newsletter entitled "Regulatory News: What's going on with PJM's BRA and House Bill 6?" which explained HB6 and its connection to the Company, in pertinent part, in the following:

**What is Ohio's HB 6?**
When initially introduced, the purpose of the legislation was for all Ohio electricity customers to pay to keep open Lake County's Perry and Ottawa County's Davis-Besse nuclear plants, owned by FirstEnergy Solutions (FES), a subsidiary of FirstEnergy Corp. However, ***the goal of the legislation expanded to support additional renewable energy resources while eliminating certain utility energy***

29

*efficiency activities and renewable portfolio compliance standards*. The expansion to HB 6 came with the expectation that distribution charges would be reduced by eliminating the energy efficiency rider charge while promoting clean air resources.

On July 24, 2019, Ohio Governor Mike DeWine signed into law HB 6. This law creates the Nuclear Generation Fund and the Renewable Generation Fund, to be administered by the Ohio Air Quality Development Authority. These funds allow for a "qualifying nuclear resource" or a "qualifying renewable resource" to be eligible for participation in the programs for one or more program years, as determined by the Authority.

**What's included in HB 6?**
***HB 6 essentially contains five main provisions.***
1. Establishes a Clean Air Fund to subsidize two nuclear power plants.
***2. Renewable Funding Opportunity, which supports pre-qualified solar projects certificated before June 2019.***
***3. Ohio Valley Electric Corporation (OVEC) Statewide Recovery Charge, subsidizing two coal-fired power plants.***
***4. Reduced Renewable Portfolio Standards (RPS) required by electricity suppliers.***
5. Energy efficiency programs offered by utilities end December 2020.

**What are the details of each provision in HB 6?**

*       *       *

***Renewable Funding Opportunity***
HB 6 supports eligible solar facilities over 50MW that already have siting certification as of June 2019. ***AEP Ohio has two eligible solar renewable facilities located in Highland County.*** These are the Willowbrook project (100MW) and the Hecate project (300MW).

***Through the renewable funding opportunity, a $9 per MWh credit is paid to project owners of eligible solar facilities for a total of $20 million annually, which covers about 1,000MW of solar.*** This credit is assessed from the $20 million renewable portion of the Clean Air Fund as described above.

***OVEC Statewide Recovery***
The Ohio Valley Electric Corporation (OVEC) and the Indiana-Kentucky Electric Corporation (IKEC) are generating stations originally built in the 1950s and provided electric power for the U.S. Department of Energy's uranium enrichment facilities then near Portsmouth, Ohio. Today, OVEC and IKEC own two coal power plants; Kyger Creek Generating Station (1.1GW) in Cheshire, Ohio and Clifty Creek Generating Station (1.3GW) in Madison, Indiana. Under HB 6, OVEC and IKEC will receive subsidies to support their coal-fired power plants.

*Effective January 1, 2020, distribution customers throughout Ohio will incur a non-bypassable charge, called the Purchased Power Agreement (PPA) Rider. The rider for residential customers is $1.50 per month. Commercial and industrial customers' monthly charge is $1,500 for this rider.* The PPA Rider will begin in 2021 and will be reviewed by the Commission every three years to determine continuation of the rider, which is to end December 31, 2030.

**Reduced Renewable Portfolio Standards**
In 2008, the State of Ohio established their Renewable Portfolio Standards (RPS) policy. This policy required providers selling electricity to consumers to provide a specific percentage of that supply from renewable sources. Currently, the RPS policy states 12.5% of your electricity must come from renewable energy sources by 2027, with 0.5% required to be solar.

*HB 6 reduces the RPS target for utilities and competitive retail energy suppliers to 8.5%, and the solar portion is eliminated by December 31, 2026.* This means that most Ohio customers will see a price reduction by the elimination of RPS requirements effective January 1, 2027. *However, an AEP Ohio customer should read the section below on the AEP Ohio bypassable renewable legacy charge, as you will continue to receive this charge through 2032.*

(Emphasis added.)

62.    The September 16, 2019, newsletter also stated the following, in pertinent part,

regarding the referendum effort to repeal HB6 – without mentioning the Company's own actions:

**Potential Referendum on Ohio HB 6**
Groups are forming a campaign to add a referendum on the November 2020 ballot to repeal HB 6. Opponents include environmental groups opposed to the elimination of energy efficiency programs and developers of natural gas-fired power plants opposed to the subsidy for nuclear generation. These groups are circulating a petition, seeking 1,000 signatures from registered Ohio voters in hopes of adding a referendum to the 2020 election.

The petition was approved by the Ohio Attorney General David Yost on August 29, 2019. *The next step opponents will take is to obtain approximately 266,000 additional signatures to place the petition on the November 2020 ballot for a vote.* Finally, a majority vote is needed to approve the petition for the repeal of HB 6.

*Meanwhile FES [FirstEnergy Solutions Corp., now Energy Harbor Corp.] filed a challenge to the petition with the Supreme Court of Ohio on September 4, stating HB 6 is a tax and tax laws are exempt from referendums.*

This petition process will take a long time before being resolved and may create market uncertainty for everyone at each step of the process. This uncertainty may impact energy supply plans and strategies for all involved.

(Emphasis added.)

63.     On October 24, 2019, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019 (the "3Q 19 10-Q") which was signed by Defendant Buonaiuto. Attached to the 3Q 19 10-Q were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

64.     The 3Q 19 10-Q stated the following regarding HB6:

In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero or reduced carbon emissions was signed into law by the Ohio Governor.  The clean energy legislation phases out current energy efficiency and renewable mandates no later than 2020 and after 2026, respectively.  The bill provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032. ***The clean energy legislation also includes a provision for recovery of OVEC costs through 2030 which will be allocated to all electric distribution utilities on a non-bypassable basis.*** OPCo's Inter-Company Power Agreement for OVEC terminates in June 2040. To the extent that OPCo is unable to recover the costs of renewable energy contracts on a bypassable basis by the end of 2032, recover costs of OVEC after 2030 or fully recover energy efficiency costs through 2020 it could reduce future net income and cash flows and impact financial condition.

(Emphasis added.)

65.     On February 20, 2020, AEP filed its yearly report on Form 10-K with the SEC for the year ended December 31, 2019 (the "2019 Annual Report") which was signed by Defendants Akins, Tierney, and Buonaiuto. Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

66.     The 2019 Annual Report stated the following, in pertinent part, regarding HB6:

> *In January 2020, provisions enacted as part of Ohio Am. Sub. H.B. 6 went into effect that replace the PPA rider and enable OPCo to continue recovering the net cost associated with the ICPA [Inter-Company Power Agreement], including any additional contractual entitlement received as a result of the FirstEnergy Solutions (FES) bankruptcy, through 2030.*

(Emphasis added.)

67.     On May 6, 2020, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2020 (the "1Q 20 10-Q") which was signed by Defendant Buonaiuto. Attached to the 1Q 20 10-Q were certifications pursuant to SOX signed by Defendants Akins and Tierney attesting to the accuracy of the financial statements and the disclosure of all fraud.

68.     The 1Q 20 10-Q stated the following regarding HB6:

> In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero or reduced carbon emissions was signed into law by the Ohio Governor. The clean energy legislation phases out current energy efficiency including lost shared savings revenues of $26 million annually and renewable mandates no later than 2020 and after 2026, respectively. ***The bill provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032. The clean energy legislation also includes a provision for recovery of OVEC costs through 2030*** which will be allocated to all electric distribution utilities on a non-bypassable basis. OPCo's Inter-Company Power Agreement for OVEC terminates in June 2040. To the extent that OPCo is unable to recover the costs of renewable energy contracts on a bypassable basis by the end of 2032, recover costs of OVEC after 2030 or fully recover energy efficiency costs through 2020 it could reduce future net income and cash flows and impact financial condition.

(Emphasis added.)

69.     On May 20, 2019, AEP released its 2020 Corporate Accountability Report, which stated the following, in pertinent part, regarding the Company's regulatory and legislative outlook and efforts:

> At AEP, we never have been more certain of our responsibility to a sustainable future for our customers, communities and employees. We will continue to take steps to reduce our carbon footprint, to empower customers and to value and develop our workforce. Together, our energy and future are truly boundless.

\*       \*       \*

**Public Policy & Issue Management**

Similar to other companies, AEP has a public policy strategy that seeks to inform decisions made by Congress, the Federal Energy Regulatory Commission (FERC), North American Electric Reliability Corporation (NERC), state legislatures and regulatory commissions, and Regional Transmission Organizations (RTOs).

AEP's Policy Advisory Team (PAT), consisting of senior executives across all business functions and departments, considers policy options on issues of relevance to the company and supports internal policy analysis and debate. This approach ensures that AEP is speaking with one voice and that all employees with external contacts are clear on our policy positions and objectives. Since its inception in May 2017, the PAT has reviewed more than two dozen issues, including 13 in 2019.

\*       \*       \*

**Climate & Lobbying**

Some stakeholders are asking AEP whether our lobbying practices and the policy positions taken by trade organizations to which we belong are in alignment with the Paris Climate Agreement. ***We believe in transparency and active participation in public policy development, regardless of the issue or position.*** Moreover, AEP is a respected and sought-after voice when it comes to energy policy-related matters in the U.S.

***We report on our public policy positions, annual lobbying and political contributions, policy on political contributions and trade association memberships.*** We post our lobbying policy online and have consistently acknowledged our intent to participate actively in the political process and in lobbying activities at the national, state and local levels. At AEP, we must consider a number of factors when engaging in this arena, as public policy develops through negotiation and compromise. While many divergent issues are of importance to us, we cannot invest all of our efforts to focus on a single issue. We are obligated to deliver safe, reliable, affordable and secure electricity to all of our customers, and we develop our public policy positions with that in mind.

(Emphasis added.)

70.     The statements contained in ¶¶ 29-69 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly

34

disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company covertly participated in the "the largest public corruption case in Ohio history"; (2) the Company secretly funneled substantial funds to Ohio political organizations and politicians to bribe politicians to pass HB6, which benefitted the Company and its coal-fired generation assets; (3) the Company partially funded a massive, misleading advertising campaign in support of HB6 and in opposition to a ballot initiative to repeal HB6 by passing substantial sums through a web of dark money entities and front companies in order to conceal the Company's involvement; (4) the Company aided in subverting a citizens' ballot initiative to repeal HB6; (5) as a result of the foregoing, Defendants' Class Period statements regarding the Company's regulatory and legislative efforts were materially false and misleading; (6) as a result of the foregoing, the Company would face increased scrutiny; (7) the Company was subject to undisclosed risk of reputational, legal and financial harm; (8) the bribery scheme would jeopardize the benefits the Company sought brought by HB6; (9) as opposed to the Company's repeated public statements regarding a move to clean energy, it sought a dirty energy bailout; (10) as opposed to the Company's repeated public statements regarding protection of its customers' interests, the Company sought an extra and state-mandated surcharge on its customers' bills; and (11) as a result of the foregoing, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

71.     On July 25, 2020, the *Columbus Dispatch* published an article entitled "Columbus utility giant AEP funded dark money spending in HB 6 campaign" which reported the following regarding the Company's actions in connection with the growing scandal:

*A dark-money group wholly funded by House Bill 6 beneficiary and Columbus utility giant American Electric Power contributed $350,000 toward the campaigns now at the center of a racketeering and bribery case that ensnared House Speaker Larry Householder, an investigation by The Dispatch finds.*

*Empowering Ohio's Economy Inc., a nonprofit operated solely with AEP funds, gave $150,000 to Generation Now, another dark-money group* that received $60 million from FirstEnergy-related interests to ensure passage and survival of a $1 billion ratepayer bailout of a subsidiary's pair of nuclear power plants.

Empowering Ohio also gave $200,000 to the Coalition for Opportunity & Growth, which is related to a similarly named political action committee that spent $1 million in the 2018 campaigns of Householder-favored Republican candidates to help ensure that he had their votes to become speaker.

*An affidavit filed by an FBI agent in the racketeering case details spending of $350,000 by an unidentified "interest group that was funded exclusively by $13 million from another energy company that supported HB 6."*

*A source close to the investigation confirmed to The Dispatch that the energy company is American Electric Powe*r, a publicly traded company that serves 5.5 million customers in 11 states and earned $2.1 billion last year.

The "social welfare" nonprofit is not required to disclose its donors or the source of its funding.

*       *       *

*AEP benefited from the passage of House Bill 6 with its six-year-plus extension through 2030 of a monthly surcharge of up to $1.50 on Ohio residential electricity customers. Industrial and commercial customers can pay up to $1,500 a month. The fee generates about $50 million a year to subsidize a pair of old coal-burning power plants it partly owns in a consortium with other utilities.*

The plants -- Kyger Creek near Cheshire, Ohio, and Clifty Creek near Madison, Indiana -- were built in the mid-1950s to supply electricity to the former uranium-enrichment plant near Piketon, Ohio. *AEP owns the biggest stake in the coal plants at 43% and buys about 60% of the electricity generated by the plants.*

*       *       *

American Electric Power's political action committee contributed nearly $672,000 to Ohio politicians and parties between 2016 and mid-2020, including $17,250 to Householder and $86,792 to the House Republicans' campaign account.

*      *      *

"I don't know what they were up to," Hadden [a board member of AEP's political action committee, a lawyer who has represented AEP] said of Generation Now and Coalition for Opportunity & Growth, adding he did not recall which board member sought the funding. He said he never discussed the matter with DeWine.

*      *      *

Empowering Ohio's Economy spent $162,500 on lobbying between 2016 and 2018, according to its tax filings. *The group was not registered with the state as attempting to influence legislation.*

*The Coalition for Opportunity & Growth, the independent-expenditure political action committee which received $200,000 from the AEP dark-money group in 2017, the dark-money Coalition & Opportunity PAC that backed Householder candidates and Generation Now* all were incorporated by Eric Lycan, a lawyer and Republican consultant in Lexington, Kentucky.

While not identified in the affidavit, the Coalition for Opportunity & Growth cash went largely unused until early this year, when it went out to support Householder-blessed candidates in the GOP primary, the FBI affidavit said.

*It was laundered through the related PAC to conceal its association with Generation Now, the FBI affidavit states: "Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it."*

The FBI affidavit said FirstEnergy interests provided $390,000 to the group, which paid $54,000 to Generation Now, $191,000 to a media-placement firm, $200,000 to a public relations firm and $100,000 to JPL & Associates, a firm controlled by Jeff Longstreth, Householder's top political aide. Longstreth is among those arrested and facing up to 20 years in prison if convicted in the H.B. 6 case.

*      *      *

Householder and four others were arrested Tuesday following an FBI investigation that captured phone calls, text messages and recordings of meetings centering around *the alleged pay-to-play scheme described by U.S. Attorney Dave DeVillers as the largest public corruption case in Ohio history*.

(Emphasis added.)

72.    On this news, shares of AEP shares fell $4.79 per share, or over 5%, to close at $83.26 per share on July 27, 2020, the next trading day, on unusually heavy trading volume, damaging investors.

73.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

74.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased AEP securities publicly traded during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of AEP, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

75.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded publicly. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.

76.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

77. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

78. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of AEP;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused AEP to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of AEP securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

79. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

80. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- AEP shares met the requirements for listing, and were listed and actively traded on the NYSE exchange, an efficient market;

- As a public issuer, AEP filed periodic public reports;

- AEP regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- AEP's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- AEP was followed by a number of analysts who wrote reports that were widely distributed and publicly available.

81. Based on the foregoing, the market for AEP securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

82. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

<u>COUNT I</u>

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**

**<u>Against All Defendants</u>**

83.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

85.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

86.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of AEP securities during the Class Period.

87.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

88.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other AEP personnel to members of the investing public, including Plaintiff and the Class.

89.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing AEP securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

90.     Had Plaintiff and the other members of the Class been aware that the market price of AEP securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased AEP securities at the artificially inflated prices that they did, or at all.

91.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

92.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of AEP securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

93.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of AEP's business affairs. Because of their senior positions, they knew the adverse non-public information about AEP's misstatement of revenue and profit and false financial statements.

95.     As officers and/or directors of a publicly owned company, Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

96.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning AEP's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AEP securities.

97.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: August 20, 2020

Respectfully submitted,

**KARON LLC**

*/s/* Daniel R. Karon
Daniel R. Karon (OH 0069304)
Beau D. Hollowell (OH 0080704)
700 W. St. Clair Ave, Ste. 200
Cleveland, Ohio 44113
Tel.: 216.622.1851
Fax: 216.241.8175
Email: dkaron@karonllc.com
          bhollowell@karonllc.com

Liaison Counsel


**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
          lrosen@rosenlegal.com

*Counsel for Plaintiff*