UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| DIANA NICKERSON, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:20-cv-04243-SDM-EPD |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | Judge Sarah D. Morrison Magistrate Judge Elizabeth Preston Deavers |
| AMERICAN ELECTRIC POWER COMPANY, INC., et al., | ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) | |

AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

THE KERGER LAW FIRM, LLC
RICHARD M. KERGER
4159 Holland Sylvania Road, Suite 101
Toledo, OH 43623
Telephone: 419/255-5990

CUMMINS LAW LLC
JAMES R. CUMMINS (0000861)
312 Walnut Street, Suite 1530
Cincinnati, OH 45202
Telephone: 513/721-9000

Local Counsel for Lead Plaintiffs

ROBBINS GELLER RUDMAN
 & DOWD LLP
DANIEL S. DROSMAN
DOUGLAS R. BRITTON
X. JAY ALVAREZ
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

LEVI & KORSINSKY, LLP
GREGORY M. NESPOLE
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212/363-7500

Lead Counsel for Lead Plaintiffs

**STATEMENT OF THE CASE**

1.      This case is about American Electric Power Co. Inc.'s ("AEP" or the "Company")

deceptive involvement in the Ohio political process and, in particular, its efforts to pass and then

defend Ohio House Bill 6 ("HB6") – a purported clean energy bailout bill that Governor Michael

DeWine signed into law on July 23, 2019, which entailed a $61 million bribery scandal involving

Speaker of the Ohio House of Representatives Larry Householder ("Householder") and his

associates, two of which Jeff Longstreth ("Longstreth") and Juan Cespedes ("Cespedes") have pled

guilty to a Racketeer Influence and Corrupt Organizations ("RICO") Conspiracy violation.  Despite

AEP's direct involvement in funding Householder's criminal enterprise and working directly with

Householder's associates on particular language for HB6, Defendants (defined herein) told investors

and the public between April 25, 2019 and July 24, 2020 (the "Class Period") that AEP was involved

in the political process for the limited purpose of "understand[ing] the policies and regulations that

could affect our business" but emphasized that in doing only that "AEP discloses lobbying activities

and political contributions" because "[w]e believe in transparency."  And when describing HB6,

Defendants stated that AEP did not support a bill that provided "just a bailout for one company or

another" and that it could not "estimate the impact [of HB6] on [AEP]" because management was

still "analyzing the impact of this legislation."  In fact, when describing a referendum to repeal HB6,

Defendants pointed only to FirstEnergy Corp.'s ("FirstEnergy") "challenge to the petition with the

Supreme Court of Ohio," saying nothing about AEP's own concerted efforts to oppose the

referendum.

2.      Defendants' statements were false and misleading.  AEP was not transparent about its

political contributions or its involvement, especially those involving HB6.  Instead, AEP operated

through an opaque web of non-profits and dark money contributions to secretly funnel donations to

- 1 -

Householder and his criminal associates to secure passage of HB6 and, ultimately when needed, to oppose the referendum.

3.     At the same time that AEP was proclaiming "transparency" and representing that it opposed a "bailout for one company or another," it concealed that AEP executives were personally involved in both the passage and defense of HB6, working closely with Householder's representatives on language in HB6 to secure and implement its own bailout – a cost recovery mechanism for the Kyger Creek (Cheshire, Ohio) and Clifty Creek (Madison, Indiana) coal-fired energy plants of which AEP owned 43% through the Ohio Valley Electric Corporation ("OVEC").[1]

4.     Far from acting transparently, AEP secretly funded the effort to pass and defend HB6. In fact, between 2017 and 2019, AEP donated $900,000 through its own "Empowering Ohio's Economy" ("EOE") non-profit to the Generation Now ("Generation Now") and Coalition for Growth & Opportunity ("Coalition"), non-profits linked directly to Householder and his Political Strategist – and admitted felon – Longstreth, increasing contributions to Generation Now ten-fold from $50,000 in 2018 to $550,000 in 2019, the year HB6 became law.

5.     AEP was the exclusive contributor to EOE. And AEP and FirstEnergy were the only two contributors to Coalition. AEP was thus intimately involved in funding the very criminal enterprise implicated in the indictment. And Generation Now just pled guilty to a Racketeering charge, admitting that it was created for the purpose of "advanc[ing] Householder's efforts to become Speaker of the Ohio House of Representatives" and to receive money in return for specific action by Householder to get HB6 passed:

> As part of the conspiracy, GENERATION NOW was organized at HOUSEHOLDER's direction for the benefit of HOUSEHOLDER and the HOUSEHOLDER Enterprise, knowing that the purpose of GENERATION NOW was for it to be used as a mechanism to receive undisclosed donations to benefit HOUSEHOLDER and to advance HOUSEHOLDER's efforts to become Speaker of

---

[1]     OVEC is an energy company jointly owned by AEP and several nonaffiliated utility companies.

the Ohio House of Representatives.  As part of the conspiracy, GENERATION NOW received money from Company A (as defined in the Indictment) for the benefit of the Defendants and others in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear power plants in Ohio . . . .

See Plea Agreement, *United States v. Generation Now*, No. 1:20-CR-00077-TSB (S.D. Ohio Feb. 5, 2021).[2]  Longstreth signed Generation Now's plea agreement as a "Representative of GENERATION NOW."  He also oversaw "political activities" at Coalition, the other non-profit linked to Householder that was funded by dark money contributions from AEP and FirstEnergy.

6.     AEP made sure that its funds could be used to fund Householder's criminal enterprise.  EOE, in fact, executed a "grant agreement" with Generation Now to permit the very type of political spending at the center of the HB6 scandal, permitting contributions for such broad categories as "'educating, equipping, and mobilizing our citizens to take action on critical economic and legislative issues.'"  The truth was that while AEP distanced itself from HB6 publicly, it was in fact flooding Householder (and politicians aligned with Householder) with contributions to secure HB6's passage, including dark money contributions through its EOE non-profit.

7.     Defendants knew that their statements about AEP's purported transparency and HB6 involvement (or lack thereof) were untrue and misleading.  While the non-profit arrangements allowed AEP to contribute to Householder in the dark, AEP structured EOE to nonetheless maintain control over its contributions.  In fact, AEP appointed Tom Froehle ("Froehle"), the Vice President of external affairs for AEP and AEP's top lobbyist to EOE's Board of Directors and had James B.

---

[2]     Generation Now's plea agreement admits to having received money "from Company A" and that "GENERATION NOW engaged in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by Company A to GENERATION NOW." Company A in the plea agreement references FirstEnergy.  While the plea agreement does not identify AEP by name, its contributions to the criminal enterprise and the admitted purpose of Generation Now, combined with the nature, scope, and timing of AEP's contributions reveal a level of involvement that: (i) made AEP's statements about its transparency and about HB6 false and misleading and (ii) support a strong inference of scienter.

- 3 -

Hadden, an attorney who represented AEP in the past, serve on its Board and as its President. At the same time, Froehle represented AEP in the Ohio legislature specifically concerning HB6, informing "Members of the Ohio House of Representatives" on May 22, 2019 that "American Electric Power – Ohio supports House Bill 6" and stating that "[t]his bill will allow AEP Ohio to make investments that our customers have been asking us to provide." Froehle signed the letter in his capacity as "Vice President, External Affairs[,] American Electric Power." He also testified in support of HB6 in his AEP capacity. There was thus no distinction between AEP and EOE with respect to the HB6 legislation and EOE's dark money contributions to support the legislation.

8. Defendants also knew that their statements about AEP's political involvement, including its professed belief in "transparency" and its protestations about HB6 being "just a bailout for one company or another" were false and misleading because AEP employees were directly involved in drafting the bill. Far from having to analyze the bill before discussing it publicly, AEP knew it intimately as its employees were working directly with Householder and his associates and were trying to secure cost recovery provisions similar to what AEP had been unsuccessfully trying to secure on its own for years; Indeed, an email exchange involving AEP's counsel confirmed that discussions about those provisions were being funneled to Householder and his Senior Policy Advisor Pat Tully:

> While we are very grateful and appreciative of everyone working to reach a consensus position, the bottom line is **this language is now in Pat Tully's hands and it will be up to him and Speaker Householder to make the final determination as to how they would like to address this matter**. Perhaps we should just let them look at the language and make their decision. After all, ultimately that is the final authority at this time.

*See* OH_subpoena_Tully0000000079_00036.

9. At the same time, AEP employees worked directly with Householder associates to ensure provisions beneficial to AEP, including the OVEC Plants (defined herein), were included in the bill. Indeed, on June 24, 2019 – just one month before Governor DeWine signed HB6 into law –

- 4 -

Maria L. Haberman, AEP's Director of Government Affairs, sent Pat Tully, Householder's Senior Policy Advisor, an email in which she forwarded proposed amendments to HB6.  The following two amendments were ultimately incorporated in the final bill and signed into law and sought to "ensure continuous OVEC cost recovery through 2030" for AEP:

### D. Clarifying amendments for continuous OVEC net impact recovery through 2030

*(1) Amend definition of "'prudently incurred costs related to a national security generation resource" in section 4928.0l(A)(42) of the Revised Code as follows:*

• In line 1259 after the word "former", insert the following language: "sponsor under such power agreement or"

\*       \*       \*

*(3) Amend new section 4928.148 of the Revised Code as follows:*

• In line 1386, insert the following after the comma: "including recovery of any deferrals that exist at that time,"

*See* OH_subpoena_Tully0000000011 at 1, 4.

10.     HB6 was clearly a priority for AEP.  As *The Columbus Dispatch* reported on July 25, 2020, "AEP benefited from the passage of House Bill 6 with its six-year-plus extension through 2030 of a monthly surcharge of up to $1.50 on Ohio electricity customers," "generat[ing] about $50 million a year to subsidize a pair of old coal-burning power plants."  But for AEP, particularly Defendants Akins and Tierney (defined herein) as Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively, it also meant avoiding a repeat of the financial calamity that AEP experienced in 2016 when it was forced to take a $2.3 billion impairment charge because of "a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio."  As the email exchange between in-house counsel for AEP and a consultant working with Householder's policy advisor confirmed, "avoid[ing] any impairment for the Company [was] a critical component" of HB6:

- 5 -

This proposal creates a regulatory asset – to be recovered as a distribution expense through subsequent rate cases only if the clean air fund does not fully reimburse the Company. So there is no new nonbypassable charge and no immediate rate impact (beyond eliminating our current bypassable AER charge). ***This approach avoids any impairment for the Company – which is a critical component for the Company as we discussed last week*** . . . .

11.     AEP was not the only beneficiary of Defendants' deceptive scheme. Defendants Akin and Tierney both cashed in on over $12 million in insider trading proceeds during the Class Period. And these Defendants timed their sales perfectly – over 80% of their insider sales occurred when AEP's stock price was near its Class Period peak. Remarkably, these Defendants had not sold a single share of stock at any point in at least the two year period before the Class Period. AEP instead settled in cash Restricted Stock Units for these executives during that period but in amounts that were a fraction of their stock sales during the Class Period.

12.     Then, on July 25, 2020, *The Columbus Dispatch* published an article entitled "Columbus utility giant AEP funded dark-money spending in HB 6 campaign," revealing that "[a] dark money group wholly funded by House Bill 6 beneficiary and Columbus utility giant American Electric Power contributed $350,000 toward the campaigns now at the center of a racketeering and bribery case that ensnared House Speaker Larry Householder." The article detailed the dark-money contributions sourced to AEP and noted how AEP benefitted from HB6's passage, causing a sell-off in AEP shares. AEP shares dropped from a close of $85.83 on July 24, 2020 to $81.16 on July 27, 2020, falling $4.67 per share (over 5%) on the next trading day on volume that was 11 times higher than the previous trading day, damaging investors.

13.     Defendant Akins admitted after the Class Period that since 2015 AEP had contributed $8.7 million in dark money to EOE, promising to be transparent with its political contributions in the future.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district and the Company is headquartered in this judicial district.

17.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Lead Plaintiffs Seafarers Health and Benefits Plan and the Seafarers Vacation Plan (collectively, the "Seafarers Plans") and James J. Durrett, Jr. purchased AEP securities during the Class Period and were economically damaged thereby.

19.     Defendant AEP is an electric public utility holding company which engages in the generation, transmission, and distribution of electricity for sale to retail and wholesale customers in the United States, including in Ohio.

20.     AEP is incorporated in New York and its principal executive office is located at 1 Riverside Plaza, Columbus, Ohio.  AEP's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AEP" and the Company's preferred stock trades on the NYSE under the ticker symbol "AEP-PB."

- 7 -

21.    Defendant Nicholas K. Akins ("Akins") has served as the Company's President, CEO, and Chairman during the Class Period.  Akins also served as Chairman and CEO of all of AEP's major subsidiaries.  Akins previously held various positions at AEP, including President of AEP from January 2011 until October 2011, and Executive Vice President of AEP from 2006 to 2011.  Akins was previously employed by the former Central and South West Corporation, which merged with AEP in 2000.

22.    Defendant Brian X. Tierney ("Tierney") has served as the Company's CFO and Executive Vice President during the Class Period.  On November 2, 2020, after the fraud was revealed to the market, AEP announced that Tierney would no longer serve as CFO and would become EVP of Strategy.  Tierney has held a number of positions since he joined AEP in 1998, including Executive Vice President of AEP Utilities East beginning in 2008, SVP of Commercial Operations and a number of other management positions.

23.    Defendants Akins and Tierney are collectively referred to herein as the "Individual Defendants."

24.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because the wrongful acts complained of herein were carried out within the scope of their employment.

25.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to AEP under respondeat superior and agency principles.  *See* ¶86 *infra*.

26.    Defendant AEP and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.     AEP Serves Approximately 1.5 Million Customers in Ohio, Its Largest Customer Base of Any State, Through the Operation of Decades Old Coal-Fired Plants**

27.     Incorporated under the laws of the State of New York in 1906 and reorganized in 1925, AEP is a public utility holding company that owns, directly or indirectly, all the outstanding common stock of its public utility subsidiaries and varying percentages of other subsidiaries in Arkansas, Indiana, Kentucky, Louisiana, Michigan, Ohio, Oklahoma, Tennessee, Texas, Virginia, and West Virginia.  AEP is one of America's largest generators of electricity, owning or operating about 24,000 megawatts of generating capacity in the United States.  The Company's generating capacity comes primarily from coal-fueled power plants (45%), as well as natural gas (28%), nuclear (7%), wind, hydro, pumped storage, and other sources (17%), and energy efficiency (3%).

28.     One of AEP's most important subsidiaries is Ohio Power Co. ("OPCo").  OPCo, registered in Ohio as AEP Ohio, is engaged in the transmission and distribution of electric power to approximately 1,494,000 retail customers in Ohio (or roughly 30% of AEP's total customers) and purchases energy and capacity at auction to serve generation service customers who have not switched to a competitive generation supplier.  Restructuring laws in Ohio have required AEP, through OPCo, to unbundle previously integrated regulated rates for its retail customers.

29.     Ohio has the largest number of retail customers compared to any other state that AEP operates in and approximately thirty-percent of AEP's generation in Ohio comes from coal-fired plants.  Through AEP Ohio, AEP generates energy in Ohio through two coal-fired plants owned by OVEC, which is jointly owned by AEP and several nonaffiliated utility companies, including FirstEnergy (whose interest was transferred to FirstEnergy Solutions in 2018 after declaring bankruptcy), Duke Energy, and Dayton Power and Light.  These plants include the Kyger Creek

- 9 -

Plant in Cheshire, Ohio and Clifty Creek Plant in neighboring Madison, Indiana (collectively, the "OVEC Plants"). The Clifty Creek Plant has transmission lines connecting to power plants in Ohio.

30. Under the Inter-Company Power Agreement ("ICPA"), which defines the rights of OVEC's owners and sets the power participation ratio of each owner, the sponsoring companies are entitled to receive and are obligated to pay for all OVEC capacity (approximately 2,400 MWs) in proportion to their respective power participation ratios. The aggregate equity participation of AEP in OVEC is 43.47%, which is the largest of all its owners. In 2010, the ICPA was extended until 2040, obligating AEP to operate the OVEC Plants until such time.

**B.     AEP Is Subject to Strict Regulations in Ohio Regarding the Rates It Can Charge Customers, Making It Nearly Impossible to Recover Operational Costs for Its Coal-Fired Plants**

31. As a regulated entity, AEP is subject to traditional cost-based regulation by the state utility commissions, as well as regulations by the Federal Energy Regulatory Commission ("FERC") under the Federal Power Act. This regulatory scheme means that if AEP wants to recover certain plant operational costs or expenses through rates charged to its customers, it cannot do so unless it first seeks and then obtains approval from state and/or federal regulatory agencies.

32. Unlike other states, Ohio has a deregulated retail electricity market, which does not have a guaranteed rate of recovery. Deregulation requires generation assets to be separated from transmission and distribution assets and the energy produced is subject to market prices. This is designed to deliver consumer cost savings since consumers can compare rates and select the energy provider of their choice.

33. To operate in the deregulated market, AEP is required to participate in a wholesale market called PJM, a regional transmission organization which is regulated by FERC. The regulators at PJM decide which power sources are run in Ohio and what AEP can charge the ratepayer. Generators offer their units to the market based on their short-term variable cost, and PJM

- 10 -

ranks them from lowest to highest price. The market price is then set by the most expensive plant needed to meet demand.

34.     AEP's operations have been adversely impacted by the deregulated market in which the Company operates. AEP has stated that a "significant risk" is the outcome of Reliability Pricing Model ("RPM") capacity auctions, which determine the prices AEP will be paid for its generating capacity. Capacity payments "represent an important portion of a plant's income" making the PJM market prices vital to AEP's future in Ohio. Traditionally, these rates are volatile, and the PJM capacity auctions determine prices paid for capacity three years in advance. The volatility of the capacity auction results makes it difficult for AEP to make long-term investment decisions concerning its generating capacity since there is no guaranteed rate of recovery.

35.     While the market rates set in Ohio were volatile and did not allow AEP to recover its operational costs, AEP was entitled to seek rate increases from federal and state regulators by filing rate cases. In Ohio, this means that AEP must seek approval to charge increased rates from Political Utilities Commission of Ohio ("PUCO") and/or FERC.

36.     Given the high operational costs of AEP's coal-fired plants, the ability to obtain increases through rate cases was, as AEP explained, imperative to the viability of its plants:

> [P]ublic utility subsidiaries currently provide service at rates approved by one or more regulatory commissions. ***If these regulatory commissions do not approve adjustments to the rates charged, affected AEP subsidiaries would not be able to recover the costs associated with their planned extensive investments. This would cause financial results to be diminished.***

**C.     AEP Is Required to Spend Billions of Dollars in Plant Upgrades and Prematurely Close Its Coal-Fired Plants in Order to Achieve Compliance with Environmental Regulations**

37.     Prior to and throughout the Class Period, the world has been undergoing a transformation from fossil fuels, which pollute the earth, to renewable resources, which promote a cleaner and more sustainable environment. As a result of this shift, the energy industry has seen

- 11 -

tremendous change marked by an increase in renewable energy capacity and a rise in global investments.  At the heart of this initiative is a focus to reduce energy-related $CO_2$ emissions.

38.     As a result of this shift, AEP's coal-fired plants are subject to increasingly strict environmental compliance requirements.  As one of the most highly regulated sectors of the U.S. economy, the energy sector is subject to numerous federal, state, and local regulations, including guidelines set by the U.S. Environmental Protection Agency ("EPA"), FERC, North American Reliability Corporation ("NERC"), and state public utility laws (such as PUCO), among others.

39.     As a Company that historically generated approximately 70% of its power through burning coal, compliance with environmental rules and regulations has required, and continues to require, AEP to commit significant capital toward monitoring, installing pollution control equipment, paying emission fees, and obtaining permits at all of AEP facilities.  AEP's efforts of compliance are significant, with the Company cautioning in its 2016 Form 10-K that "[i]f substantial additional CO2 emission reductions are required, there will be significant increases in capital expenditures and operating costs which would hasten the ultimate retirement of older, less-efficient, coal-fired units."  Significantly, in July of 2019, Defendant Akins remarked that "'[w]e invested nearly $9 billion in capital since 2000 to drastically cut emissions from our coal-fueled power plants.'"  The Company cautioned that "[e]xcessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities and could lead to possible impairment of assets."

### D.     AEP Needed Cost-Recovery Legislation in Ohio to Avoid Massive Impairment Charges and Closures to Its Coal-Fired Plants, Some of Which Have Been Operating at a Loss for Nearly a Decade

40.     Given the billions of dollars AEP invested in environmental compliance, it became imperative that AEP pass these compliance costs to Ohio ratepayers.  This was particularly true for the OVEC coal plants, which have been selling electricity for less than it costs to generate since

2012. According to OVEC's 2019 financial statements, OVEC had approximately $1.3 billion of debt of which AEP was responsible for over $555 million through the ICPA, and reported only $3 million in net income for the year.

41.     Despite the fact the OVEC Plants have been unprofitable for almost a decade, AEP could not shed its interest in OVEC without approval from all other ICPA members. Indeed, AEP attempted to sell its OVEC interests when Ohio became a deregulated state in 2001, when AEP, through OPCo, attempted to assign its rights and obligations under the ICPA to an affiliate to comply with corporate separation required by Ohio law. AEP, however, failed to obtain the consent from the other OVEC owners. As AEP would later explain, AEP would never be able to receive consent to sell its ownership interest:

> [T]he main reason OVEC owners ultimately withheld their consent for the transfer was that AEP Ohio's favorable credit rating; ***because the co-owners could incur liability if their partners default, the co-owners had no real reason to agree to the proposed transfer. Because those circumstances have not changed, there is no reason for AEP Ohio to try again – because the same result would be expected.***

42.     Thus, because AEP had no option but to continue operating the unprofitable OVEC Plants, it was imperative that it obtain state or federal subsidies to cover the costs of its investments and operations.

### E.     AEP's Failure to Obtain Subsidies for Its AEP Generation Ohio Coal-Fired Plants Results in a $2.3 Billion Impairment

43.     Since 2012, AEP's OVEC coal-fired power plants had failed to turn a profit. Recognizing that AEP's financial situation was dire, Defendants sought to salvage their bottom line and avoid impairment by recouping losses through subsidies collected from Ohio ratepayers. In 2013, Defendants sought to recoup costs for certain of AEP's other failing coal plants in Ohio (the "Affiliate Power Purchase Agreement" or "Affiliate PPA"), including Cardinal 1, Conesville 4, 5, and 6, Stuart 1, 2, 3, and 4, and Zimmer 1, noting that "the future market-based revenue uncertainty and fixed cost structure make them vulnerable to early retirement." The Affiliate PPA sought to

- 13 -

enter an agreement between AEP Ohio and AEP Generation Resources Inc. ("AEPGR") whereby AEP Ohio would purchase the output of specific generating units owned by AEPGR. This was purportedly designed to protect the reliability of electricity supply, maintain fuel diversity, and protect against the adverse impact of early plant closures. In 2014, AEP amended the Affiliate PPA to include an additional rider seeking cost recovery for the OVEC Plants (the "OVEC Rider"). Pablo Vegas, AEP's then President and Chief Operations Officer, informed the PUCO in May 2015 of the urgency needed for cost recovery, pleading that AEP "*cannot continue to take all the risk for the broken PJM market structure and needs the Commission's assistance with approval of the proposed Affiliated PPA and inclusion of it and the existing OVEC PPA in the PPA Rider to preserve Ohio's economy*."

44. After years of briefing, discovery, hearings and public comments, on March 31, 2016, AEP was successful in convincing PUCO to approve the Affilate PPA and authorize the collection of OVEC related costs through subsidiaries collected from Ohio ratepayers.

45. Despite PUCO's ruling, in April 2016, FERC, however, rejected the proposal because *all* Ohio ratepayers would be forced to pay the subsidy, even those who opted for other suppliers in Ohio's electric choice program.

46. The FERC's denial of AEP's subsidiary request was devastating, resulting in a massive $2.3 billion impairment charge in 2016. As the Company reported, the impairment was the result of unlikely cost recovery in Ohio:

> In September 2016, due to AEP's ongoing evaluation of strategic alternatives for its merchant generation assets, declining forecasts of future energy and capacity prices, and *a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio providing for the recovery of AEP's existing Ohio merchant generation assets,* AEP performed an impairment analysis at the unit level on the remaining merchant generation assets in accordance with accounting guidance for impairments of long-lived assets. The evaluation was performed using generating unit specific estimated future cash flows and resulted in a material impairment of certain merchant generation fleet assets. *As a result, AEP recorded a pretax impairment of $2.3 billion ($1.5 billion, net of tax) in Asset Impairments and Other*

***Related Charges on the statement of operations related to 2,684 MWs of Ohio merchant generation*** including Cardinal Unit 1, 43.5% ownership interest in Conesville Unit 4, Conesville Units 5-6, 26.0% ownership interest in Stuart Units 1-4, and 25.4% ownership interest in Zimmer Unit 1, as well as Putnam coal and I&M's Price River coal reserves, Desert Sky and Trent Wind Farms and the merchant generation portion of the Oklaunion Plant. As of September 30, 2016, the remaining net book value of these assets is $50 million.

47. During the third quarter 2016 earnings call, Defendant Tierney explained the impairment as follows:

> ***The vast majority of this impairment is associated with generating units, some of which served regulated customers in Ohio for more than four decades. We are required to conduct the asset impairment test due to the reduced likelihood of cost recovery in Ohio*** that Nick mentioned earlier, declining prices for capacity and energy, and the market intelligence that we had gained in the recent sale process of other generating assets.
>
> There will be no cash tax savings from this impairment until the units are either sold or retired. However, coincident with the impairment, the capital budget for these plants was reduced by approximately $400 million over the remaining life of the plants. These are dollars that will be reinvested in our regulated or contracted businesses.
>
> This asset impairment, combined with the previously announced sale of our other Ohio-generating assets, puts the financial impact of the costly Ohio deregulation debacle squarely behind us. To be clear, we now have a significantly smaller financial footprint in Ohio, but we also have wires companies that, in the state, earn very attractive returns.

48. The FERC's revocation of the Affiliate PPA posed similarly grave concerns as to the outcome of the OVEC Plants, as the previously approved OVEC Rider's validity was now in question. Without the Affiliate PPA, AEP was now requesting approval of cost recovery for the OVEC Plants only, a request that was previously denied by PUCO as not showing a significant benefit to Ohio ratepayers.

49. Consequently, AEP filed an application for rehearing, removing the Affiliate PPA and requesting approval of a modified OVEC rider that sought cost recovery for the OVEC Plants only. PUCO ultimately approved the request, but opponents would continue to challenge the validity and

- 15 -

legal authority of PUCO in the wake of FERC's decision, challenges that made it up to the Supreme Court of Ohio.

50.     Given that it takes several years of filings, hearings, rehearings, and strong opposition before obtaining a decision from PUCO, time was not on AEP's side.  Rather, AEP needed immediate certainty that it could recover costs for the OVEC Plants.  Thus, while AEP was battling opponents in front of PUCO and the Ohio Supreme Court, Defendant Akins declared during a first quarter 2017 call that "First, *we are looking for permanent support* of the PPA that provides OVEC generation to AEP Ohio customers.  The PUCO has previously approved our recovery of these costs, but *we need to fortify this through legislation*."

### F.     AEP Turns to Legislative Action Through the Introduction of HB239, Only to Have It Die in Committee

51.     As the economics of coal-generated power became increasingly untenable relative to other more affordable energy sources, Defendants knew legislative action was their only option to secure desperately needed financial support for the OVEC Plants.

52.     In May 2017, AEP attempted to save the OVEC Plants by seeking legislative assistance through House Bill 239 ("HB239").  As introduced, HB239 would provide nearly $256.6 million in subsidies to the OVEC Plants to be recovered annually from ratepayers for the 24-year period of 2017-2040.  Not coincidentally, if passed, the bill would have guaranteed income for all the OVEC Plants' owners for the remaining years of the ICPA.  The bill, however, failed to make it out of the legislative committee it was assigned to and died.

53.     After HB239 failed, AEP's only option was to support Householder by donating $900,000 through EOE to Generation Now and Coalition to help pass and defend HB6.  Immediately after HB6's passage, Neil Clark ("Clark") admitted that Mr. Householder was a pay to play politician and that HB6 was solely for the benefit of creating subsidies for utilities.  Clark explained

that "'I did this campaign.  All we cared about was getting the subsidy.'"[3]  Clark previously

remarked in June 2019 that he liked politicians like Mr. Householder who "'will go to the wall, but

those guys that go to the wall can only did it once a year because if they do it all the time everybody

knows they're pay to play.'"[4]

### MATERIALLY FALSE AND MISLEADING STATEMENTS
### MADE DURING THE CLASS PERIOD

54.     The Class Period begins on April 25, 2019, when AEP held a conference call to

discuss its first quarter 2019 results.  During the call, Defendant Tierney addressed HB6 – what he

called "the Ohio clean air fund legislation" – in his introductory comments, stating that AEP was

supportive of the effort in the legislature to address "key energy policy issues," but listed the issues

that AEP said it needed to be addressed for its support, including issues surrounding renewable

portfolio standards and the elimination of energy efficiency programs.  Tierney noted that AEP was

emphasizing these issues "to achieve a balanced energy bill that provides benefits to all Ohio

customers":

> Now to the Ohio clean air fund legislation.  The company is supportive of the
> Ohio House leadership's focus and efforts on addressing key energy policy issues
> that have plagued the state for years.  In order for the legislation to benefit all Ohio
> customers, there are certain issues that must be addressed.
>
> First, an elimination of the renewable portfolio standard should be replaced
> with the opportunity for utilities to voluntarily develop economic renewable
> resources in the state.  In addition, contracts entered into under the existing
> renewable portfolio standard must be grandfathered so as to not punish utilities who
> are compliant with Ohio law.
>
> Second, in regards to energy efficiency.  AEP is concerned about a rapid
> elimination of EE programs that have benefited our customers for many years.  In
> lieu of immediate elimination of EE programs, previously approved plans should be
> phased out over the next several years.  We look forward to working with lawmakers

---

[3]     Indictment at ¶100.

[4]     Indictment at ¶101.

during the process to achieve a balanced energy bill that provides benefits to all Ohio customers.

55.     Defendant Tierney also responded during the call to a question from an analyst about "AEP['s] utility ratepayers paying for other companies nuclear plants."  Continuing to emphasize AEP's interest in helping "all Ohio customers," Tierney again listed the issues that AEP purportedly wanted to have addressed before it would support the bill, including "energy efficiency, the renewable portfolio standard, [and the] ability of utilities to invest in renewables going forward." Tierney added that "[i]f it's just a bailout for one company or another, it's not as beneficial to all Ohio customers":

> [PAUL PATTERSON:] Okay.  And then with respect to the Ohio legislation, previously, you guys, I think, had concerns about AEP utility ratepayers paying for other companies' nuclear plants.  How do you guys feel about HB 6 as it currently stands?  I mean I know you raised a couple of the issues in your prepared remarks this morning.  Can you just give a little more color on that?
>
> [BRIAN X. TIERNEY:] So we think if there's a full package where all of Ohio customers can benefit, then it's a worthy effort.  If it's just a bailout for one company or another, it's not as beneficial to all Ohio customers.  So there needs to be a full package of things that get addressed.  And energy efficiency, the renewable portfolio standard, ability of utilities to invest in renewables going forward are all important things that need to be in the bill.  And if they're not, it's not as beneficial for ratepayers in the state.

56.     The statements referenced above in ¶¶54-55 about HB6 were false and misleading when made.  While emphasizing "renewable portfolio standard" and "energy efficiency [programs]" that would benefit "all Ohio customers," Tierney concealed that the primary driver for AEP's lack of support for HB6 (as introduced in the House on April 12, 2019) was the lack of any cost-recovery provision governing AEP's own coal-fired plants.  AEP thus was not concerned about "a bailout for one company," as Tierney expressed, provided that it too was included in that bailout.  And it worked aggressively in secret to secure it.  Indeed, at the same time that Tierney was publicly emphasizing renewable standards and energy efficiency programs, AEP was working with (and contributing to) Householder's criminal enterprise – which since has been indicted for accepting

- 18 -

bribe payments in return for official action from Householder on HB6 – to secure AEP's own bailout. What investors did not know was that AEP had made substantial contributions to Householder's criminal enterprise (and continued to make contributions) through its EOE non-profit, which as a 501(c)(4) entity afforded AEP anonymity. EOE was AEP's dark money alter ego. Defendant Akin not only admitted that AEP contributed $8.7 million to EOE from 2015 – 2020, but investigations have uncovered that AEP was EOE's *only* contributor and that Froehle, AEP's VP of External Affairs and Director of EOE, directed EOE's contributions to Householder's HB6 effort while, at the very same time, lobbying for HB6 and testifying in support of the bill in his AEP capacity. This arrangement not only allowed AEP to operate in the dark, but it was also a clever workaround AEP's corporate policy, which provided that "'AEP cannot lawfully make Corporate Political Contributions to candidates for elected office in . . . Ohio . . . .'" Tierney concealed that Defendants were violating AEP's own policy to secure cost-recovery for its coal-fired plants.[5]

57. AEP's contributions to Householder's criminal enterprise, all of which were concealed from investors, were extensive. Through EOE, AEP secretly contributed $900,000 to directly to the criminal enterprise, including to Generation Now, itself having pled guilty to a count of Racketeering, and to Coalition, of which Longstreth (an admitted participant in the RICO conspiracy and Householder's top political strategist) oversaw political activities. Notably, Coalition was funded exclusively by AEP and FirstEnergy, which was implicated in the Householder bribery scheme outlined in the Householder indictment. AEP's contributions included $200,000 to Coalition in 2017 and a separate stream of contributions for the express purpose of "Advocacy" to Generation Now, including $100,000 in 2017 and $50,000 in 2018. By 2019, when Householder's criminal enterprise was pushing HB6 through the Ohio legislature and into law, AEP had escalated its

---

[5] Empowering Ohio's Economy raised a total of $8.7 million from 2015-2020, the same amount Defendant Atkins confirmed that AEP contributed. Empowering Ohio's Economy also received $700,000 in 2020 from a *single* contributor.

contributions to Generation Now to $550,000, funds obviously tied to the amendments that Householder would ultimately include in HB6. Coincidentally, AEP would actually try to contribute $800,000 to Householder's criminal enterprise in 2019 but Generation Now did not cash a $250,000 check.

58. On May 9, 2019, AEP announced over *PRNewswire* that it released its 2019 Corporate Accountability Report, which was available at www.aepsustainability.com.[6] AEP told the public that it participated in the political process, including by contributing to political candidates "[t]o understand the policies and regulations that could affect our business" and stated clearly that "AEP publicly discloses lobbying activities and political contributions" because it "believ[ed] in transparency and active participation in public debate":

**Lobbying and Political Contributions**

\*    \*    \*

The investments needed to modernize the power grid are in the billions of dollars, and the stakes have never been higher. ***To understand the policies and regulations that could affect our business, we participate in a number of organizations, lobby on our customers' behalf and contribute to political candidates, where allowed by law.***

***Each year, AEP publicly discloses lobbying activities and political contributions.*** We also annually report on the portions of membership dues paid to organizations such as the U.S. Chamber of Commerce and Edison Electric Institute (EEI) that go toward lobbying. We post our lobbying policy online and we discuss political contributions annually with AEP's Board of Directors' Committee on Directors and Corporate Governance.

\*    \*    \*

***We believe in transparency and active participation in public debate. Our experience is that open, candid discussion and a good-faith attempt to reach common ground is the best way to do business.***

---

[6]  *See* https://www.prnewswire.com/news-releases/aep-releases-2019-corporate-accountability-report-300847272.html.

59.     The statements referenced above in ¶58 were materially false and misleading when made and could not have been further from the truth.  AEP, in fact, was not transparent about its political contributions at all, which it made primarily for reasons other than "understand[ing] the policies and regulations that could affect [AEP's] business."  Instead, AEP was operating and advancing its own political interests in its coal-fired plants by secretly contributing $900,000 to Householder's criminal enterprise, which funded Householder and political candidates aligned with Householder who would support HB6.  Thus, at the same time that they were emphasizing "transparency," AEP was working through its dark money alter ego to circumvent its own policy emphasizing that "'AEP cannot lawfully make Corporate Political Contributions to candidates for elected office in . . . Ohio . . . .'"  In fact, while it was emphasizing "transparency," AEP failed to disclose, and what investors could not know, was that AEP had increased its contributions to Householder's criminal enterprise ten-fold from $50,000 in 2018 to $550,000 in 2019, the year HB6 became law and AEP finally secured the coal-fired cost recovery provisions that it had long desired.  These facts directly contradicted the claims in AEP's Corporate Accountability Report that AEP believed in transparency and publicly disclosed its political contributions, which was readily available on the Company's website.

60.     On July 25, 2019, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q 19 10-Q"), which both Akins and Tierney certified "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  In the 2Q 19 10-Q, Defendants addressed HB6 and represented that management "cannot estimate the impact on results of operations, cash flows or financial condition" because it was "analyzing the impact of this legislation":

- 21 -

- In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero- or reduced carbon emissions was signed into law by the Ohio Governor. The clean energy legislation phases out current energy efficiency and renewable mandates after 2020 and 2026, respectively. The bill also provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032 and includes a provision for recovery of certain legacy generation resources which will be allocated to all electric distribution utilities on a non-bypassable basis. ***Management is analyzing the impact of this legislation and at this time cannot estimate the impact on results of operations, cash flows or financial condition.***

61. The statements referenced above ¶60 were materially false and misleading. AEP, in fact, was able to estimate the impact of the legislation on its financial results, at least with respect to coal-fired cost recovery. AEP had been trying to secure cost-recovery for the coal-fired plants for years and certainly knew HB6's implications. Indeed, when publicly claiming ignorance about how HB6 would affect AEP, its executives were working directly with Householder to add cost recovery provisions to the bill while Froehle, AEP's VP of External Affairs, was advocating for those very provisions in the Ohio legislature. Documents uncovered in governmental investigations demonstrate that AEP actually calculated how HB6 would impact AEP's financial performance – at a minimum it would allow AEP to avoid impairment charges, which it described as "a critical component for the Company." *See* ¶10, *supra*. Defendants' statements thus created the misleading impression that AEP was not behind HB6's cost-recovery provisions when in fact, it was a driving force of the amendment that brought coal-fired cost recovery into HB6. Defendants thus fraudulently concealed that: (a) AEP was actively involved in funding the passage and defense of HB6 through its EOE non-profit, which allowed AEP to advance its political interests and advocate for HB6 in the dark; (b) between 2017 and 2019 AEP secretly funneled through its dark money alter ego EOE $900,000 to Generation Now and Coalition to fund the passage of HB6, including contributions to political candidates aligned with Householder; (c) EOE's contributions to Generation Now increased ten-fold from $50,000 in 2018 to $550,000 in 2019, the year HB6 became law, which clearly linked AEP's contributions to HB6's coal-fired cost recovery amendments; and

(d) these contributions violated AEP's internal policy stating that "'AEP cannot lawfully make Corporate Political Contributions to candidates for elected office in . . . Ohio . . . .'"

62. On July 25, 2019, AEP held a conference call to discuss its second quarter 2019 financial results. During the call, Defendant Akins commented on HB6, highlighted the provisions in the new law that would benefit AEP, and congratulated Householder, among others, for balancing the "interest of a need for a balanced portfolio, employment and economic development issues and customer benefits":

> ***Now onto the next hot issue, the Ohio House Bill 6 legislation.*** Governor DeWine earlier this week signed legislation that will provide support to the nuclear units in Ohio as well as support for the OVEC generating units. While the legislation phases out the RPS mandate after 2026, it still provides benefits for the recovery of existing renewable contracts until 2032 and provides additional support for solar projects that have already received signing approval, including our 400 megawatts of proposed solar project, which can also collect from the same clean energy fund as the nuclear units.

> ***So to reiterate, as far as AEP is concerned, we see positives from this legislation for us, namely recovery of OVEC collected – that's collected on a statewide basis through 2030.*** Secondly, recovery of our existing renewable contracts entered into to comply with previous legislation and approved by the PECO. The opportunity for AEP Ohio to enter into bilateral contracts with certain customers. This one is an important issue for AEP as we have had specific requests from various customers for AEP Ohio to be the provider of renewable resources in addition to being the wires provider.

> And fourth, the ability for solar projects that have siting board approval to access the $20 million of the clean air funds, which includes the 400 megawatts of solar that we now have before the PECO. The access to these funds make these particular projects even more beneficial for customers and, as you recall, the request for these projects include a $6 million per year debt equivalency rider to maintain AEP Ohio's capital structure.

> And finally, the net impact of HB 6 will provide headroom to our rate payers, which will enable potential additional distribution investments to improve the customer experience and grid reliability.

> AEP does believe in the importance of nuclear generation as a part of the portfolio of this country and the State of Ohio. ***We congratulate Speaker Householder; Senate President Obhof; Governor DeWine; Lieutenant Governor Husted and Chairman Randazzo***, along with many other members of the Ohio

legislature in balancing the interest of a need for a balanced portfolio, employment and economic development issues and customer benefits.

63.    The statements referenced above in ¶62, including congratulating Householder for "balancing the interest[s]" of various constituents to achieve important legislation, were misleading and omitted material information.  These statements created the impression that the legislation was drafted and passed pursuant to a legitimate process when, in truth, the process was corrupted and designed to benefit AEP and other energy companies to the detriment of ratepayers.  These statements created the false impression that AEP was merely a distant beneficiary of the bill when, in truth, AEP was actively involved in getting the bill passed, including working with Householder's associates on specific language to be included in the bill that benefited AEP and by funding Householder's criminal enterprise.

64.    Defendants thus fraudulently concealed that: (a) AEP was actively involved in funding the passage and defense of HB6 through its EOE non-profit, which allowed AEP to advance its political interests and advocate for HB6 in the dark; (b) between 2017 and 2019 AEP secretly funneled through its dark money alter ego EOE $900,000 to Generation Now and Coalition to fund the passage of HB6, including contributions to political candidates aligned with Householder; (c) EOE's contributions to Generation Now increased ten-fold from $50,000 in 2018 to $550,000 in 2019, the year HB6 became law, which clearly linked AEP's contributions to HB6's coal-fired cost recovery amendments; and (d) these contributions violated AEP's internal policy stating that "'AEP cannot lawfully make Corporate Political Contributions to candidates for elected office in . . . Ohio . . . .'"  Akins also fraudulently concealed that AEP remained extensively involved with HB6 after its passage.  In fact, he failed to mention that AEP's dark money contributions were funding opposition to the referendum.  These facts paint a very different portrait of AEP's involvement in HB6 than what Akins described publicly.

65.     On September 16, 2019, AEP published a newsletter entitled "Regulatory News: What's going on with PJM's BRA and House Bill 6?" In the newsletter, AEP explained HB6 and its connection to the Company, in pertinent part, in the following:

**What is Ohio's HB 6?**

When initially introduced, the purpose of the legislation was for all Ohio electricity customers to pay to keep open Lake County's Perry and Ottawa County's Davis- Besse nuclear plants, owned by FirstEnergy Solutions (FES), a subsidiary of FirstEnergy Corp. ***However, the goal of the legislation expanded to support additional renewable energy resources while eliminating certain utility energy efficiency activities and renewable portfolio compliance standards.*** The expansion to HB 6 came with the expectation that distribution charges would be reduced by eliminating the energy efficiency rider charge while promoting clean air resources.

On July 24, 2019, Ohio Governor Mike DeWine signed into law HB 6 . This law creates the Nuclear Generation Fund and the Renewable Generation Fund, to be administered by the Ohio Air Quality Development Authority. These funds allow for a "qualifying nuclear resource" or a "qualifying renewable resource" to be eligible for participation in the programs for one or more program years, as determined by the Authority.

*          *          *

**What are the details of each provision in HB 6?**

*          *          *

***Renewable Funding Opportunity***

HB 6 supports eligible solar facilities over 50MW that already have siting certification as of June 2019. ***AEP Ohio has two eligible solar renewable facilities located in Highland County.*** These are the Willowbrook project (100MW) and the Hecate project (300MW).

***Through the renewable funding opportunity, a $9 per MWh credit is paid to project owners of eligible solar facilities for a total of $20 million annually, which covers about 1,000MW of solar.*** This credit is assessed from the $20 million renewable portion of the Clean Air Fund as described above.

***OVEC Statewide Recovery***

The Ohio Valley Electric Corporation (OVEC) and the Indiana-Kentucky Electric Corporation (IKEC) are generating stations originally built in the 1950s and provided electric power for the U.S. Department of Energy's uranium enrichment facilities then near Portsmouth, Ohio. Today, OVEC and IKEC own two coal power plants; Kyger Creek Generating Station (1.1GW) in Cheshire, Ohio and Clifty Creek

- 25 -

Generating Station (1.3GW) in Madison, Indiana. Under HB 6, OVEC and IKEC will receive subsidies to support their coal-fired power plants.

*Effective January 1, 2020, distribution customers throughout Ohio will incur a non-bypassable charge, called the Purchased Power Agreement (PPA) Rider. The rider for residential customers is $1.50 per month. Commercial and industrial customers' monthly charge is $1,500 for this rider.* The PPA Rider will begin in 2021 and will be reviewed by the Commission every three years to determine continuation of the rider, which is to end December 31, 2030.

*Reduced Renewable Portfolio Standards*

In 2008, the State of Ohio established their Renewable Portfolio Standards (RPS) policy. This policy required providers selling electricity to consumers to provide a specific percentage of that supply from renewable sources. Currently, the RPS policy states 12.5% of your electricity must come from renewable energy sources by 2027, with 0.5% required to be solar.

*HB 6 reduces the RPS target for utilities and competitive retail energy suppliers to 8.5%, and the solar portion is eliminated by December 31, 2026.* This means that most Ohio customers will see a price reduction by the elimination of RPS requirements effective January 1, 2027. *However, an AEP Ohio customer should read the section below on the AEP Ohio bypassable renewable legacy charge, as you will continue to receive this charge through 2032.*

66. The September 16, 2019 newsletter also discussed the referendum to repeal HB6.

The newsletter explained the referendum, outlined the next steps for opponents of HB6, and

represented that "FES filed a challenge to the petition with the Supreme Court of Ohio on September

4, stating HB 6 is a tax and tax laws are exempt from referendums":

*Potential Referendum on Ohio HB 6*

Groups are forming a campaign to add a referendum on the November 2020 ballot to repeal HB 6. Opponents include environmental groups opposed to the elimination of energy efficiency programs and developers of natural gas-fired power plants opposed to the subsidy for nuclear generation. These groups are circulating a petition, seeking 1,000 signatures from registered Ohio voters in hopes of adding a referendum to the 2020 election.

The petition was approved by the Ohio Attorney General David Yost on August 29, 2019. *The next step opponents will take is to obtain approximately 266,000 additional signatures to place the petition on the November 2020 ballot for a vote.* Finally, a majority vote is needed to approve the petition for the repeal of HB 6.

> *Meanwhile FES [FirstEnergy Solutions Corp., now Energy Harbor Corp.] filed a challenge to the petition with the Supreme Court of Ohio on September 4, stating HB 6 is a tax and tax laws are exempt from referendums.*

> This petition process will take a long time before being resolved and may create market uncertainty for everyone at each step of the process. This uncertainty may impact energy supply plans and strategies for all involved.

67. The statements in ¶¶65-66 about HB6 were materially false and misleading. Defendants concealed that AEP was a driving force behind the coal-fired cost recovery provisions in HB6, including its involvement with Householder associates, its contributions to Householder to support passage of HB6, and its contributions to fund opposition to the referendum. Defendants thus fraudulently concealed that: (a) AEP was actively involved in funding the passage and defense of HB6 through its EOE non-profit, which allowed AEP to advance its political interests and advocate for HB6 in the dark; (b) between 2017 and 2019 AEP secretly funneled through its dark money alter ego EOE $900,000 to Generation Now and Coalition to fund the passage of HB6, including contributions to political candidates aligned with Householder; (c) EOE's contributions to Generation Now increased ten-fold from $50,000 in 2018 to $550,000 in 2019, the year HB6 became law, which clearly linked AEP's contributions to HB6's coal-fired cost recovery amendments; and (d) these contributions violated AEP's internal policy stating that "'AEP cannot lawfully make Corporate Political Contributions to candidates for elected office in . . . Ohio . . . .'"

68. Defendants' statements in ¶66 about FirstEnergy's efforts to oppose the referendum were materially false and misleading. Those statements created the false impression that only FirstEnergy was opposing the referendum when, in truth, AEP's contributions were being used to fund that opposition. As the *Columbus Dispatch* reported on July 25, 2020:

> A dark-money group wholly funded by House Bill 6 beneficiary and Columbus utility giant American Electric Power contributed $350,000 toward the campaigns now at the center of a racketeering and bribery case that ensnared House Speaker Larry Householder, an investigation by The Dispatch finds.

- 27 -

Empowering Ohio's Economy Inc., a nonprofit operated solely with AEP funds, gave $150,000 to Generation Now, another dark-money group that received $60 million from FirstEnergy-related interests to ensure passage and survival of a $1 billion ratepayer bailout of a subsidiary's pair of nuclear power plants.

69.     On October 24, 2019, AEP filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019 (the "3Q 19 10-Q"), which both Akins and Tierney represented "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The 3Q 19 10-Q stated the following regarding HB6:

In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero or reduced carbon emissions was signed into law by the Ohio Governor.  The clean energy legislation phases out current energy efficiency and renewable mandates no later than 2020 and after 2026, respectively. The bill provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032.  ***The clean energy legislation also includes a provision for recovery of OVEC costs through 2030 which will be allocated to all electric distribution utilities on a non-bypassable basis.***  OPCo's Inter-Company Power Agreement for OVEC terminates in June 2040.  To the extent that OPCo is unable to recover the costs of renewable energy contracts on a bypassable basis by the end of 2032, recover costs of OVEC after 2030 or fully recover energy efficiency costs through 2020 it could reduce future net income and cash flows and impact financial condition.

70.     On February 20, 2020, AEP filed its yearly report on Form 10-K with the SEC for the year ended December 31, 2019 (the "2019 Annual Report") which Defendants Akins and Tierney not only signed, but also certified "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The 2019 Annual Report described HB6's coal-fired cost recovery provisions but failed to mention AEP's involvement with the criminal enterprise that accepted bribes in return for passage of the bill:

***In January 2020, provisions enacted as part of Ohio Am. Sub. H.B. 6 went into effect that replace the PPA rider and enable OPCo to continue recovering the net cost associated with the ICPA [Inter-Company Power Agreement], including any***

- 28 -

*additional contractual entitlement received as a result of the FirstEnergy Solutions (FES) bankruptcy, through 2030.*

71. The statements referenced above in ¶¶69-70, were materially false and misleading when made. Defendants fraudulently concealed that: (a) AEP was actively involved in funding the passage and defense of HB6 through its EOE non-profit, which allowed AEP to advance its political interests and advocate for HB6 in the dark; (b) between 2017 and 2019 AEP secretly funneled through its dark money alter ego EOE $900,000 to Generation Now and Coalition to fund the passage of HB6, including contributions to political candidates aligned with Householder; (c) EOE's contributions to Generation Now increased ten-fold from $50,000 in 2018 to $550,000 in 2019, the year HB6 became law, which clearly linked AEP's contributions to HB6's coal-fired cost recovery amendments; and (d) these contributions violated AEP's internal policy stating that "'AEP cannot lawfully make Corporate Political Contributions to candidates for elected office in . . . Ohio . . . .'"

72. On May 20, 2020, AEP released its 2020 Corporate Accountability Report, which repeated AEP's earlier statements about transparency around its political participation, including the disclosure of its political contributions:

> At AEP, we never have been more certain of our responsibility to a sustainable future for our customers, communities and employees. We will continue to take steps to reduce our carbon footprint, to empower customers and to value and develop our workforce. Together, our energy and future are truly boundless.
>
> *     *     *

**Public Policy & Issue Management**

> Similar to other companies, AEP has a public policy strategy that seeks to inform decisions made by Congress, the Federal Energy Regulatory Commission (FERC), North American Electric Reliability Corporation (NERC), state legislatures and regulatory commissions, and Regional Transmission Organizations (RTOs).
>
> AEP's Policy Advisory Team (PAT), consisting of senior executives across all business functions and departments, considers policy options on issues of relevance to the company and supports internal policy analysis and debate. This approach ensures that AEP is speaking with one voice and that all employees with external contacts are clear on our policy positions and objectives. Since its inception

- 29 -

in May 2017, the PAT has reviewed more than two dozen issues, including 13 in 2019.

* * *

### Climate & Lobbying

Some stakeholders are asking AEP whether our lobbying practices and the policy positions taken by trade organizations to which we belong are in alignment with the Paris Climate Agreement. **We believe in transparency and active participation in public policy development, regardless of the issue or position.** Moreover, AEP is a respected and sought-after voice when it comes to energy policy-related matters in the U.S.

**We report on our public policy positions, annual lobbying and political contributions, policy on political contributions and trade association memberships.** We post our lobbying policy online and have consistently acknowledged our intent to participate actively in the political process and in lobbying activities at the national, state and local levels. At AEP, we must consider a number of factors when engaging in this arena, as public policy develops through negotiation and compromise. While many divergent issues are of importance to us, we cannot invest all of our efforts to focus on a single issue. We are obligated to deliver safe, reliable, affordable and secure electricity to all of our customers, and we develop our public policy positions with that in mind.

73. The statements referenced above in ¶72, were materially false and misleading when made. AEP was not transparent about its involvement in the HB6 legislation, its opposition to the referendum, and certainly did not disclose the dark money contributions that it made to (and through) EOE. Instead, Defendants fraudulently concealed that: (a) AEP was actively involved in funding the passage and defense of HB6 through its EOE non-profit, which allowed AEP to advance its political interests and advocate for HB6 in the dark; (b) between 2017 and 2019 AEP secretly funneled through its dark money alter ego EOE $900,000 to Generation Now and Coalition to fund the passage of HB6, including contributions to political candidates aligned with Householder; (c) EOE's contributions to Generation Now increased ten-fold from $50,000 in 2018 to $550,000 in 2019, the year HB6 became law, which clearly linked AEP's contributions to HB6's coal-fired cost recovery amendments; and (d) these contributions violated AEP's internal policy stating that "'AEP

- 30 -

cannot lawfully make Corporate Political Contributions to candidates for elected office in . . .

Ohio . . . .'"

## THE TRUTH EMERGES

74.    On July 26, 2020, the *Columbus Dispatch* published an article entitled "Columbus

utility giant AEP funded dark money spending in HB 6 campaign" which reported the following

regarding the Company's actions in connection with the growing scandal:

> *A dark-money group wholly funded by House Bill 6 beneficiary and Columbus utility giant American Electric Power contributed $350,000 toward the campaigns now at the center of a racketeering and bribery case that ensnared House Speaker Larry Householder, an investigation by The Dispatch finds.*

> *Empowering Ohio's Economy Inc., a nonprofit operated solely with AEP funds, gave $150,000 to Generation Now, another dark-money group* that received $60 million from FirstEnergy-related interests to ensure passage and survival of a $1 billion ratepayer bailout of a subsidiary's pair of nuclear power plants.

> Empowering Ohio also gave $200,000 to the Coalition for Opportunity & Growth, which is related to a similarly named political action committee that spent $1 million in the 2018 campaigns of Householder-favored Republican candidates to help ensure that he had their votes to become speaker.

> *An affidavit filed by an FBI agent in the racketeering case details spending of $350,000 by an unidentified "interest group that was funded exclusively by $13 million from another energy company that supported HB 6."*

> *A source close to the investigation confirmed to The Dispatch that the energy company is American Electric Power*, a publicly traded company that serves 5.5 million customers in 11 states and earned $2.1 billion last year.

> The "social welfare" nonprofit is not required to disclose its donors or the source of its funding.

>                    *         *         *

> *AEP benefited from the passage of House Bill 6 with its six-year-plus extension through 2030 of a monthly surcharge of up to $1.50 on Ohio [residential] electricity customers.  Industrial and commercial customers can pay up to $1,500 a month. The fee generates about $50 million a year to subsidize a pair of old coal-burning power plants it partly owns in a consortium with other utilities.*

> The plants – Kyger Creek near Cheshire, Ohio, and Clifty Creek near Madison, Indiana – were built in the mid-1950s to supply electricity to the former

uranium-enrichment plant near Piketon, Ohio. ***AEP owns the biggest stake in the coal plants at 43% and buys about 60% of the electricity generated by the plants.***

\* \* \*

American Electric Power's political action committee contributed nearly $672,000 to Ohio politicians and parties between 2016 and mid-2020, including $17,250 to Householder and $86,792 to the House Republicans' campaign account.

\* \* \*

Empowering Ohio's Economy spent $162,500 on lobbying between 2016 and 2018, according to its tax filings. ***The group was not registered with the state as attempting to influence legislation.***

***The Coalition for Opportunity & Growth, the independent-expenditure political action committee which received $200,000 from the AEP dark-money group in 2017, the dark-money Coalition & Opportunity PAC that backed Householder candidates and Generation Now*** all were incorporated by Eric Lycan, a lawyer and Republican consultant in Lexington, Kentucky.

While not identified in the affidavit, the Coalition for Opportunity & Growth cash went largely unused until early this year, when it went out to support Householder-blessed candidates in the GOP primary, the FBI affidavit said.

***It was laundered through the related PAC to conceal its association with Generation Now, the FBI affidavit states: "Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it."***

The FBI affidavit said FirstEnergy interests provided $390,000 to the group, which paid $54,000 to Generation Now, $191,000 to a media-placement firm, $200,000 to a public relations firm and $100,000 to JPL & Associates, a firm controlled by Jeff Longstreth, Householder's top political aide. Longstreth is among those arrested and facing up to 20 years in prison if convicted in the H.B. 6 case.

\* \* \*

Householder and four others were arrested Tuesday following an FBI investigation that captured phone calls, text messages and recordings of meetings centering around ***the alleged pay-to-play scheme described by U.S. Attorney Dave DeVillers as the largest public corruption case in Ohio history.***

75.     On this news, shares of AEP shares fell $4.67 per share, or over 5%, to close at

$81.16 per share on July 27, 2020, the next trading day, on unusually heavy trading volume,

damaging investors.

76. Additionally, on October 29, 2020, Longstreth and Cespedes both pleaded guilty to participating in a racketeering conspiracy, facing up to 20 years in prison and fines up to $250,000. As part of the plea agreements, Longstreth admitted to participating in the organization and management of Generation Now "as a mechanism to receive undisclosed donations to benefit HOUSEHOLDER and to advance HOUSEHOLDER's efforts to become Speaker of the Ohio House of Representatives."

77. In a separate statement of facts signed October 6, 2020, Cespedes admitted his participation in a larger conspiracy, orchestrating Generation Now payments "in return for specific official action by Householder relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear plants in Ohio" and to block the ballot campaign to overturn the $1 billion bailout for the plants in HB6.

78. On January 29, 2021, Generation Now signed an agreement with the U.S. Attorney's Office for the Southern District of Ohio to plead guilty to one count of racketeering for its role in funneling money in the bribery scandal, agreeing to a term of not more than 5 years' probation, fines up to $250,000, fees, and forfeiting bank accounts with balances of over $1.5 million.

79. In a separate statement of facts signed January 29, 2021, Generation Now, through Longstreth, admitted to being a part of the conspiracy, being at the benefit of Mr. Householder, and acting to assist Mr. Householder in the "passage and preservation of legislation that would go into effect and save the operation of two nuclear power plants in Ohio . . . ." Generation Now also admitted its role in concealing the "nature, source, ownership, and control of the payments made by Company A to GENERATION NOW."

80. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiffs and other Class members were damaged.

## ADDITIONAL SCIENTER ALLEGATIONS

81.     The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading.  The Individual Defendants knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

82.     By virtue of their receipt of information reflecting the true facts regarding AEP's operations and the market in which it operated, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning AEP, the Individual Defendants were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the alleged false and misleading information they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or reckless complicity of personnel at the highest level of the Company, including the Individual Defendants and other senior executives.

83.     Defendants here had actual knowledge that AEP made dark money contributions to support and defend HB6.   AEP, in fact, has admitted that it did.   Through its SVP of Communications and Marketing Melissa Henry, AEP has acknowledged that it contributed to 501(c) (4) and that those contributions lacked transparency:

>       "AEP has contributed to a variety of 501(c)(4) social welfare organizations to promote economic development and educational programs in the states where we operate.  We understand the concerns regarding the lack of transparency surrounding 501(c)(4) organizations, which are not required to disclose their donors and amounts donated to them."

84.     Akins also acknowledged AEP's dark money contributions to EOE.  In fact, he admitted that between 2015 and 2020 AEP donated $8.7 million to EOE.

85.     Moreover, the grant agreement between EOE and Generation Now shows that the contributions that EOE made to Generation Now were precisely of the type that were caught up in the Householder bribery scandal, which Akins admitted were not transparent.  That agreement permitted Generation Now to use AEP's contributions for "'educating, equipping, and mobilizing our citizens to take action on critical economic and legislative issues.'"  AEP ensured that its contributions were used for their intended purpose.  EOE's 2019 Form 990 confirms that it "received documentation from the organization that receive grants during the year which ensures the funds are not otherwise diverted from their intended use."

86.     Defendants were fully aware of these contributions.  As alleged at ¶7, AEP, through Froehle, sat on both sides of the transaction.  In his capacity as an EOE board member, he was involved in directing AEP's contributions to EOE to Householder's criminal enterprise while in his capacity as AEP's VP of External Affairs, he worked to advance AEP's interests by advocating for the passage of HB6, including the coal-fired cost recovery provisions that AEP's contributions helped secure.  AEP therefore knew that its contributions to EOE were being paid by EOE directly to Householder's criminal enterprise, including to Generation Now and Coalition.  *See infra*, ¶¶94(a)-(d).

87.     Defendants Akins and Tierney were also fully aware of AEP's dark money contributions.  AEP, in fact, has expressly acknowledged that board members, like Defendant Akin, were kept fully informed of issues that could affect AEP's coal–fired plants:

> ***Corporate Governance***
>
> In response to environmental issues and in connection with its assessment of AEP's strategic plan, ***the Board of Directors continually reviews the risks posed by new environmental rules and requirements that could accelerate the retirement of coal-fired generation assets.  The Board of Directors is informed of any new environmental regulations and proposed regulation or legislation that would affect the company.***  The Board's Committee on Directors and Corporate Governance

oversees the company's annual Corporate Accountability Report, which includes information about the company's environmental, financial and social performance.[7]

88.     AEP even formed a Policy Advisory Team, made up of "senior executives across AEP" who reported to Defendant Akins to "better manage public policy issues" and to represent AEP in "state capitals in our service territory," including Columbus, Ohio.  AEP acknowledged that it was necessary to keep all of the executives at AEP informed of public policy issues, of which HB6 was one, to "ensure that AEP is speaking with one voice on important public policy considerations":

**Public Policy and Issue Management**

> . . . AEP has a public policy strategy that seeks to influence decisions being made at Congress, FERC, state legislatures and regulatory commissions.  We do this to mitigate our risk exposure and to help us achieve our business objectives.
>
> ***In 2017, AEP formed the Policy Advisory Team (PAT) to better manage public policy issues. This team is composed of senior executives across AEP, including some of those who represent the company in Washington, D.C., and the state capitals in our service territory.***
>
> The PAT considers policy options on issues of relevance to the company. The multi-departmental, cross-function structure of the PAT supports internal policy analysis and debate.  ***The approach helps ensure that AEP is speaking with one voice on important public policy considerations and that all employees, and ultimately external stakeholders, are clear on our policy positions and objectives. The goal of the PAT is to ensure a smoother, more consistent policy strategy across the company.***[8]

89.     Defendants were also fully aware of AEP's dark money contributions to support HB6 because they had long sought the benefits that the legislation brought AEP.  HB6 benefitted AEP by providing substantial subsidies to save the unprofitable OVEC Plants, dismantle the state's energy standards for utilities, allow utilities, such as AEP, to lock in guaranteed levels of ratepayer revenue for decades into the future, and enabled AEP to avoid a repeat of the very high-profile impairment charge that it incurred in 2016 because of "a decreasing likelihood of cost recovery through

---

[7]     2017 Form 10-K, filed February 23, 2018; 2018 Form 10-K, filed February 21, 2019.

[8]     AEP 2018 Corporate Accountability Report, dated May 3, 2018.

regulatory proceedings or legislation in the state of Ohio." This aspect of HB6 made the legislation and efforts to support the legislation, including AEP's dark money contributions, a top priority for AEP, Akins, and Tierney. An email exchange between in house counsel for AEP and a consultant working with Householder's policy advisor even confirmed that "avoid[ing] any impairment for the Company [was] a critical component for the Company" of HB6. And it was the benefits of HB6 that drove numerous AEP employees, including Defendant Akin personally, to pour donations into Householder's campaign and into the political candidates that would support Householder. *See* ¶¶94(a)-(d). HB6 was thus a critical issue for AEP company-wide and, especially in Ohio. The benefits that HB6 brought AEP included:

(a) HB6 allowed AEP to shift costs of operating the OVEC Plants to Ohioans over time, providing a guaranteed rate of return to AEP. The bill authorized charges of up to $1.50 per month (and up to $1,500 per month for commercial and industrial users) beginning in January 2020 through 2030. In one study by the Institute for Energy Economics and Financial Analysis, it was forecasted that OVEC's operational costs would continue to rise, while market prices would remain low, resulting in $110 per year in subsidies, or $1.1 billion over the decade.

(b) HB6 provided for any subsidy riders previously approved by PUCO to be replaced with "legally generation resource" cost recovery riders applicable to all electric customers extending through December 31, 2030. In other words, AEP would receive subsidies for the remaining majority of the ICPA, protecting it against billions of dollars in losses and further impairments.

(c) HB6 further provided for a provision allowing Ohio utilities, such as AEP, to file an application for a decoupling mechanism for 2019 and each year thereafter to decouple distribution rates for residential and commercial customers to calendar year 2018 levels, lasting until PUCO approval of new base distribution rates for the utility. This would allow AEP to bill retail

customers for a surcharge if the Company's annual revenue fell below its 2018 levels.  To date, only AEP and FirstEnergy have sought permission to use the decoupling provision permitted by HB6.

90.    Defendants AEP, Akins, and Tierney were also intimately involved with HB6. Indeed, AEP's employees played a material role in drafting HB6 and worked directly with Householder on language in the bill, including the following:

(a)    On May 9, 2019, in response to language request by AEP in-house counsel Steven T. Nourse, Denny Larr of Larr Policy Consulting noted that "this language is now in Pat Tully's hands and it will be up to him and Speaker Householder to make the final determination as to how they would like to address this matter."[9]

(b)    On May 22, 2019, Froehle sent an email to the Ohio House of Representatives stating that AEP supported HB6 and that the legislation would allow AEP to make investments that "customers have been asking us to provide."[10]

(c)    On June 12, 2019, Tom Froehle testified before the Energy and Public Utilities Committee second hearing on HB6 on behalf of AEP, highlighting the OVEC Plants, the benefits of keeping jobs within Ohio through HB6's passage, and the promotion of renewable resources:

> House Bill 6 addresses Ohio's increasing reliance on out-of-state generation. ***This bill addresses legacy generation issues that have been plaguing the state for nearly a decade.***  It will allow AEP Ohio to make investments in renewables that our customers have been asking us to provide. Specifically investments that help drive economic development in the state. As a result, ***this legislation will keep and bring jobs to the state of Ohio.***
>
> AEP is focused on bringing more renewable energy resources into our generation mix throughout our 11 state territory for the last several years. Furthermore, all sectors of AEP Ohio customers are increasingly seeking renewable energy sources for their electricity supply. Some large commercial customers have

---

[9] *See* OH_subpoena_Tully0000000079_00036.

[10] OH_subpoena_Tully0000000019 at 196.

also expressed a desire for renewable power from AEP Ohio. Having these resources readily available helps make Ohio a more attractive place for these companies to locate and expand their operations.

HB 6 would allow AEP Ohio to offer renewable energy services to our customers and pose no financial risk to other customers – this is an economic development tool that AEP Ohio has been seeking clarity on for several years.

***As it relates to Ohio Valley Electric Corporation (OVEC), HB 6 provides ongoing certainty for an important and longstanding baseload generating asset. The bill also includes rates caps for customers while allowing for the continued operation of OVEC generating units, which will provide certainty for AEP Ohio's customers and Ohio jobs.***

Finally, this legislation would allow Ohio's electric utilities to offer voluntary energy efficiency plans similar to those operated by the state's natural gas utilities, a model we believe can be successful. House Bill 6 in its current form allows for AEP Ohio to finish implementation of currently-approved plans and phase out the programs.

AEP Ohio believes this legislation puts Ohio on the path of a balanced energy policy that provides benefits to all customers in this state.

(d)     On June 24, 2019 – just one month before Governor DeWine signed HB6 into law – Maria L. Haberman, AEP's Director of Government Affairs, sent Pat Tully, Householder's Senior Policy Advisor, an email in which she forwarded amendments to HB6, two of which were incorporated in the final bill and signed into law.

91.     Defendants Akins and Tierney were also motivated to commit the acts alleged herein to cash in on AEP's inflated stock price. In sales that were truly suspicious and out of line with their prior trading practices, Defendant Akins sold $9.8 million while Defendant Tierney sold $2.9 million, most of which was perfectly timed and occurred when AEP stock price was at its peak:

**AMERICAN ELECTRIC POWER**

**Summary of Insider Stock Sales and Restricted Stock Settled For Cash**
**January 1, 2017 - December 31, 2020**
(Class Period April 25, 2019 – July 24, 2020)

| Filer Name | | Transaction Date | Price | Shares | Proceeds | Annual Sold/Settled Shares | Annual Proceeds | Annual % Sold/Settled Shares |
|---|---|---|---|---|---|---|---|---|
| Akins, Nicholas K. | | 1-May-17 | $67.64 | 8,557 | $578,795 | | | |
| | | 1-May-17 | $67.64 | 6,416 | $433,978 | | | |
| | Restricted Stock Settled For Cash | 1-May-17 | $67.64 | 4,856 | $328,460 | 19,829 | $1,341,234 | 12.1% |
| | | 1-May-18 | $68.63 | 6,966 | $478,077 | | | |
| | | 1-May-18 | $68.63 | 9,646 | $662,005 | | | |
| | | 1-May-18 | $68.63 | 2,572 | $176,516 | 19,184 | $1,316,598 | 8.6% |
| | | 1-May-19 | $83.67 | 5,457 | $456,587 | | | |
| | | 2-May-19 | $84.94 | 11,152 | $947,251 | 16,609 | $1,403,838 | 9.5% |
| | | 24-Feb-20 | $102.20 | 1,900 | $194,180 | | | |
| | Insider Sales | 24-Feb-20 | $100.57 | 37,807 | $3,802,250 | | | |
| | | 24-Feb-20 | $101.58 | 29,950 | $3,042,321 | | | |
| | | 4-May-20 | $81.97 | 5,632 | $461,655 | | | |
| | | 4-May-20 | $80.99 | 5,813 | $470,795 | | | |
| | | 4-May-20 | $82.87 | 5,074 | $420,482 | 86,176 | $8,391,683 | 48.9% |
| Tierney, Brian X. | | 1-May-17 | $67.64 | 2,396 | $162,065 | | | |
| | Restricted Stock Settled For Cash | 1-May-17 | $67.64 | 1,821 | $123,172 | | | |
| | | 1-May-17 | $67.64 | 1,369 | $92,599 | 5,586 | $377,837 | 13.7% |
| | | 1-May-18 | $68.63 | 1,978 | $135,750 | | | |
| | | 1-May-18 | $68.63 | 1,486 | $101,984 | 3,464 | $237,734 | 11.6% |
| | | 1-May-19 | $83.67 | 1,539 | $128,768 | | | |
| | | 1-May-19 | $84.95 | 1,402 | $119,100 | | | |
| | Insider Sales | 14-May-19 | $86.02 | 4,392 | $377,800 | | | |
| | | 29-Jul-19 | $89.73 | 4,458 | $400,016 | 11,791 | $1,025,684 | 36.3% |
| | | 24-Feb-20 | $101.55 | 18,573 | $1,886,088 | 18,573 | $1,886,088 | 67.7% |

*Reported Holdings per Proxy Statements

92.    Significantly, Akins and Tierney did not sell a single share of stock during the two year period prior to the Class Period, but did cash in restricted stock in 2017 and 2018. Even considering the Defendants' limited disposition of vested restricted stock for a cash settlement in 2017 and 2018, the percentage their respective holdings actually sold during the Class Period rose exponentially when compared to their transactions in the two years prior to the Class Period. Furthermore, over 80% of Defendants' stock sales occurred when AEP's stock price was near its Class Period peak. Atkins and Tierney's restricted stock for cash settlement and the insider sales are set forth below:





4824-2254-2559.v1

93. Further, the scienter of the Individual Defendants, because of their executive level positions with the Company, can be imputed to Defendant AEP.

94. As discussed more fully above, the coal-fired cost recovery provisions in HB6 were critical to AEP. In fact, not only did AEP donate substantial money between 2017 and 2018 through EOE to Generation Now and Coalition – entities linked directly to Householder – to pass and defend HB6, but AEP's political action committee ("PAC") and AEP employees flooded Householder's campaign and others aligned with Householder with contributions:

(a) According to the Energy and Policy Institute and the Columbus Dispatch, on May 20, 2019, AEP's PAC contributed $12,500 to Householder's June 6, 2019 birthday fundraiser which brought in $960,000 for Householder's campaign. According to the federal affidavit in support of the complaint against Householder and others, the birthday fundraiser was held one day prior to a week in which Generation Now planned to spend nearly $2 million on media in support of HB6.

(b) Thirty-nine AEP employees, including members of the utility's top brass and lobbying teams, also contributed nearly $30,000 to Householder's campaign between October 18 and November 18, 2019, with all but one of those contributions from AEP employees made in connection with two events held on November 7 and 17, 2019. The largest contribution came Defendant Akins, who contributed $5,000 at the event on November 17, 2019. The contributions were made as follows:

**11/7/2019 Householder event:**

• $1,500 from Lisa Barton, AEP's executive vice president of utilities, who oversees the activities of all of the utility's operating companies

• $1,500 from Lana Hillebrand, AEP's chief administrative officer

• $1,500 from Charles Patton, AEP's executive vice president of external affairs

• $1,500 from Charles Zebula, AEP's executive vice president of energy supply

• 1,500 from Raja Sundararajan, president and CEO of AEP Ohio

**11/17/2019 Householder event:**

• $1,500 from David Feinberg, AEP's executive vice president, general counsel and secretary

• $1,500 from Mark McCollough, AEP executive vice president of transmission

• $1,000 from Paul Chodak, executive vice president of generation

      Brian Tierney, AEP's chief financial officer contributed an additional $1,500 on November 17[, 2019].

      (c)     Additionally, AEP made campaign contributions to seven Ohio state representatives after they joined a new selected committee tasked with repealing and replacing HB6. AEP's PAC contributed a total of $7,500 to the campaigns of the seven state representatives in September 2020.  The lawmakers make up nearly half of the fifteen-member Ohio House Select Committee on Energy Policy and Oversight.  AEP's PAC contributed $1,000 to James Hoop, the Republican chair of the select committee.  Republican committee members Brian Baldridge, Dick Stein, Jason Stephens, Scott Wiggam and Democrat Michael O'Brien also received $1,000 each. Republican Rick Carfagna received $1,500.  As has been reported in numerous public articles, AEP stands to benefit if state lawmakers fail to repeal HB6, or if they replace it with a new bill that preserves elements of the original bill.  HB6 has not yet been repealed or replaced.

      (d)     All of these contributions demonstrate a level of intimacy and support that, together with AEP's dark money contributions, raise a strong inference of scienter.

## LOSS CAUSATION

      95.     During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AEP securities.  This scheme operated as a fraud or deceit on Class Period purchasers of AEP securities by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and

- 43 -

fraudulent conduct were revealed and became apparent to the market, the price of AEP securities fell precipitously as the prior artificial inflation came out.

96.     As a result of their purchases of AEP securities during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of AEP securities fell precipitously as the prior artificial inflation dissipated.  Defendants' false and misleading statements had the intended effect and caused AEP securities, to trade at artificially inflated levels throughout the Class Period, reaching as high as $104.33 per share on February 18, 2020.

97.     By issuing materially false and misleading statements and failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of AEP's outlook, business, and prospects.  Defendants' false and misleading statements had the intended effect and caused AEP securities to trade at artificially inflated levels throughout the Class Period.

98.     The decline in the price of AEP securities after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in AEP securities negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of AEP securities and the subsequent significant declines in the value of AEP securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

- 44 -

99.     On July 25, 2020, the public for the first time became aware of AEP's dark money contributions to EOE, which in turn contributed substantial amounts of money to Generation Now and Coalition, two dark money groups directly connected to Householder.   Money which, unbeknownst to the market, was used to help pass HB6 and to defeat the referendum to repeal HB6. On this news, shares of AEP shares fell $4.67 per share, or over 5%, to close at $81.16 per share on July 27, 2020, the next trading day, on unusually heavy trading volume, damaging investors.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

100.     Lead Plaintiffs are entitled to a presumption of reliance for Defendants' material misrepresentations under the fraud-on-the-market doctrine because the market for AEP's publicly traded securities was open, well-developed, and efficient at all times.   As a result of Defendants' materially false and misleading statements, AEP's publicly traded securities traded at artificially inflated prices during the Class Period.   Lead Plaintiffs and the other members of the Class purchased or otherwise acquired AEP's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to AEP and have been damaged thereby.

101.     At all relevant times, the market for AEP's securities was an efficient market for the following reasons, among others:

(a)     AEP's securities met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a public company, AEP filed periodic public reports with the SEC and/or the NYSE;

(c)     AEP regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     AEP was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

102.     As a result of the foregoing, the market for AEP's securities promptly digested current information regarding AEP from all publicly available sources and reflected such information in AEP's securities price.  Under these circumstances, all purchasers of AEP's securities during the Class Period suffered similar injury through their purchase of AEP's securities at artificially inflated prices and a presumption of reliance applies.

103.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because this action involves Defendants' failure to disclose material adverse information regarding AEP's business, operations and risks, positive proof is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

104.     The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the false statements alleged herein.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking

- 46 -

statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of AEP who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

105. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased AEP's securities between April 25, 2019 and July 24, 2020, inclusive and who were damaged thereby ("Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

106. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AEP securities and preferred stock were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class. Millions of AEP securities were traded publicly during the Class Period on the NYSE. As of August 6, 2020, there were approximately 496 million AEP shares outstanding. Record owners and other members of the Class may be identified from records maintained by AEP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

107.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

108.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

109.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of AEP;

(c)      whether the price of AEP securities were artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

110.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

4824-2254-2559.v1

## COUNT I
### Violations of §10(b) of the Exchange Act and Rule l0b-5
### Promulgated Thereunder Against All Defendants

111.    This Count is asserted against the Defendants for violations of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

112.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

113.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

114.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market price for AEP's securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

115.    Each of the Defendants' liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) the Individual Defendants,

4824-2254-2559.v1

by virtue of their responsibilities and activities as senior officers and/or as a director of the Company, were privy to and participated in the creation, development and reporting of the Company's financial results and prospects; (iii) each of the Individual Defendants was advised of and had access to the Company's management team's internal reports and other data and information at all relevant times; and (iv) each of Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

116.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the truth regarding the Company's business prospects and supporting the artificially inflated prices of AEP's securities.  As demonstrated by Defendants' misstatements of the Company's business and prospects during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

117.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of AEP's securities were artificially inflated during the Class Period.  In ignorance of the fact that the market prices of AEP's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the markets in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class

Period, Lead Plaintiffs and the other members of the Class purchased AEP securities during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

118.     At the time of said misrepresentations and omissions, Lead Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants, Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired AEP securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

119.     By virtue of the foregoing, Defendants violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of AEP securities during the Class Period.

**COUNT II**
**Violations of §20(a)**
**of the Exchange Act Against the Individual Defendants**

120.     This Count is asserted against the Individual Defendants for violations of §20(a) of the Exchange Act.  Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

121.     By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and

- 51 -

dissemination of the various statements which Lead Plaintiffs contends are false and misleading. The Individual Defendants were provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

122.    By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiffs as Class representatives and its counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

123.    Lead Plaintiffs hereby demand a trial by jury.

DATED:  March 9, 2021                       ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            DANIEL S. DROSMAN
                                            DOUGLAS R. BRITTON
                                            X. JAY ALVAREZ
                                            FRANCISCO J. MEJIA


                              s/ X. JAY ALVAREZ
                              X. JAY ALVAREZ

                              655 West Broadway, Suite 1900
                              San Diego, CA  92101
                              Telephone:  619/231-1058
                              619/231-7423 (fax)
                              ddrosman@rgrdlaw.com
                              dougb@rgrdlaw.com
                              jaya@rgrdlaw.com
                              fmejia@rgrdlaw.com

                              LEVI & KORSINSKY, LLP
                              SHANNON L. HOPKINS
                              STEPHANIE A. BARTONE
                              1111 Summer Street, Suite 403
                              Stamford, CT  10005
                              Telephone:  203/992-4523
                              212/363-7171 (fax)
                              shopkins@zlk.com
                              sbartone@zlk.com

                              LEVI & KORSINSKY, LLP
                              GREGORY M. NESPOLE
                              55 Broadway, 10th Floor
                              New York, NY 10006
                              Telephone: 212/363-7500
                              212/363-7171 (fax)
                              gnespole@zlk.com

                              Lead Counsel for Lead Plaintiffs

4824-2254-2559.v1

THE KERGER LAW FIRM, LLC
RICHARD M. KERGER (0015864)
4159 Holland Sylvania Road, Suite 101
Toledo, OH  43623
Telephone:  419/255-5990
419/255-5997 (fax)
rkerger@kergerlaw.com

CUMMINS LAW LLC
JAMES R. CUMMINS (0000861)
312 Walnut Street, Suite 1530
Cincinnati, OH  45202
Telephone:  513/721-9000
513/721-9001 (fax)
jcummins@cumminslaw.us

Local Counsel for Lead Plaintiffs

4824-2254-2559.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on March 9, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ X. JAY ALVAREZ
X. JAY ALVAREZ

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  jaya@rgrdlaw.com

**Mailing Information for a Case 2:20-cv-04243-SDM-EPD Nickerson v. American Electric Power Company, Inc. et al**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Nicole A Allen**
  nallen@jenner.com,ASalander@jenner.com,docketing@jenner.com,8714499420@filings.docketbird.com,MLinden@jenner.com,kgarcia@jenner.com,RZheng@jenner

- **X. Jay Alvarez**
  jaya@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Stephanie Ann Bartone**
  sbartone@zlk.com

- **Douglas R Britton**
  dougb@rgrdlaw.com,e_file_sd@rgrdlaw.com,mkuwashima@rgrdlaw.com

- **James Rubin Cummins**
  jcummins@cumminslaw.us,hpoindexter@cumminslaw.us,docket@cumminslaw.us

- **Daniel Steven Drosman**
  dand@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Beau D Hollowell**
  bhollowell@karonllc.com,cgood@karonllc.com

- **Shannon L. Hopkins**
  shopkins@zlk.com,files@zlk.com,shalliday@zlk.com

- **Daniel Richard Karon**
  dkaron@karonllc.com,cgood@karonllc.com,bhollowell@karonllc.com

- **Richard M Kerger**
  rkerger@kergerlaw.com,jreuling@kergerlaw.com

- **James A King**
  jking@porterwright.com,sbarranada@porterwright.com,djosef@porterwright.com

- **J Kevin McCall**
  jmccall@jenner.com,docketing@jenner.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com

- **Francisco J Mejia**
  FMejia@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Gregory Mark Nespole**
  gnespole@zlk.com,ecf@zlk.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)