## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DIANA NICKERSON,** *et al.*,

        **Plaintiffs,**       :

    **v.**                           **Case No. 2:20-cv-4243**
                                       **Judge Sarah D. Morrison**
                                       **Magistrate Judge Elizabeth A.**

**AMERICAN ELECTRIC POWER**           **Preston Deavers**
**COMPANY, INC.,** *et al.*,         :

        **Defendants.**

## OPINION AND ORDER

Defendant American Electric Power Company, Inc. is a public company traded on the New York Stock Exchange. Plaintiffs purchased AEP stock between April 25, 2019, and July 24, 2020 (the "Class Period"). They sued under the Securities Exchange Act of 1934, alleging that AEP and two executives, Defendants Nicholas Akins and Brian Tierney, made material misrepresentations and omissions during the Class Period pertaining to AEP's involvement in a specific piece of Ohio legislation—the now-infamous House Bill 6. In Plaintiffs' view, Defendants' statements artificially inflated the company's stock price, which fell after the extent of Defendants' efforts to pass HB 6 were revealed in *The Columbus Dispatch*. The matter is now before the Court for consideration of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint. Because the Amended Complaint fails to plead any actionable misrepresentations or omissions, the Motion is **GRANTED**.

## I.     BACKGROUND

This action was first filed on August 20, 2020. (ECF No. 1.) Nearly seven months later, Plaintiffs filed the operative Amended Complaint for Violations of the Federal Securities Laws. (Am. Compl., ECF No. 28.) Defendants then filed a Motion to Dismiss Plaintiffs' Amended Complaint. (Mot., ECF No. 29.) Plaintiffs have responded (Resp., ECF No. 30) and Defendants filed their reply (Reply, ECF No. 31). The parties appeared for oral argument on November 23, 2021. (*See* ECF No. 37.) The Motion is now ripe for consideration.

All well-pled factual allegations in the Amended Complaint are considered as true for purposes of the Motion to Dismiss. *See Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). The following summary draws from the allegations in that Amended Complaint, the documents integral to and incorporated therein, and certain other documents which are subject to judicial notice.

### A.     AEP and the OVEC Plants

AEP is a public utility holding company that, through its subsidiaries, provides electricity across large swaths of the country. (Am. Compl., ¶ 27.) "AEP is one of America's largest generators of electricity, owning or operating about 24,000 megawatts of generating capacity in the United States." (*Id.*)

AEP is a part-owner of the Ohio Valley Electric Corporation ("OVEC"), which operates two coal-fired electricity generation plants along the Ohio River (the "OVEC Plants"). (*Id.*, ¶ 29.) The OVEC Plants are not profitable, having sold electricity at a loss since 2012. (*Id.*, ¶ 40.) As of 2019, "OVEC had approximately $1.3 billion of debt . . . and reported only $3 million in net income for the year." (*Id.*)

OVEC's poor financial position posed a problem for AEP, its largest shareholder. (*Id.*, ¶ 30.) Under the Inter-Company Power Agreement (the "ICPA") governing OVEC ownership, OVEC owners are entitled to receive *and obligated to pay for* all OVEC generation capacity through 2040 in proportion to their participation ratios. (*Id.*) In other words, without some alternative agreement among the OVEC owners, AEP would carry a large portion of the cost of operating the unprofitable plants for decades into the future. (*Id.*, ¶¶ 41–42.)

As early as 2013, AEP began pursuing a solution to this problem. (*Id.*, ¶ 43.) AEP first sought cost recovery from the Public[1] Utilities Commission of Ohio ("PUCO"). (*Id.*, ¶¶ 43–44.) When that effort faltered in 2016, AEP was forced to record a $2.3 billion impairment charge. (*Id.*, ¶ 45–46.) While the legal challenges stemming from AEP's application to the PUCO were ongoing, Mr. Akins publicly declared:

> [W]e [(AEP)] are looking for permanent support of the [agreement] that provides OVEC generation to AEP Ohio customers. The PUCO has previously approved our recovery of these costs, but we need to fortify this through legislation.

(*Id.*, ¶ 50.) And so, AEP turned to the legislature.

House Bill 239 was introduced in the Ohio General Assembly in May 2017. (*Id.*, ¶ 52.) "As introduced, HB239 would provide nearly $256.6 million in subsidies to the OVEC Plants to be recovered annually from ratepayers for the 24-year period of 2017–2040." (*Id.*) The bill died in committee. (*Id.*)

---

[1] The Amended Complaint incorrectly identifies this body as the *Political* Utilities Commission of Ohio. (Am. Compl., ¶ 35.) Whether a Freudian slip or an intentional aspersion, the Court will use the Commission's proper name.

In Plaintiffs' view, "AEP's only option" at that point was to "secretly funnel[]" hundreds of thousands of dollars in "dark money" to then-Speaker of the Ohio House of Representatives Larry Householder as bribe payments for passing legislation that included cost recovery for the OVEC Plants. (*Id.*, ¶¶ 53, 61.)

**B.    House Bill 6**

HB 6 was first introduced in the Ohio House of Representatives on April 12, 2019. (Resp. Ex. 1, ¶ 111, ECF No. 30-2.)

> HB 6 creates the Ohio Clean Air Program, which allows nuclear or solar clean air resources to apply to be certified clean air resources, and therefore, eligible for a subsidy of $9 per megawatt hour produced. In order to pay for the subsidy, the Ohio Air Quality Development Authority, which is tasked with administering the Ohio Clean Air Program, will institute and collect a monthly fixed charge to all residential, commercial, industrial, and large consumers. The fixed fee is projected to produce $140 million annually for the first year, then $200 million annually thereafter.

(*Id.*) By the time the bill was signed into law on July 23, 2019, it provided for OVEC cost recovery through 2030. (Allen Decl. Ex. 2, PAGEID # 619, ECF No. 29-4.)

**C.    Federal Charges**

HB 6 has since become synonymous with scandal. Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now were all indicted by a federal grand jury on racketeering and corruption charges related to its passage. (*Id.*, ¶¶ 1, 249. *See also* Am. Compl., ¶ 1; *United States v. Householder*, No. 1:20-cr-00077-TSB (S.D. Ohio, filed on July 30, 2020).) Mr. Longstreth, Mr. Cespedes, and Generation Now have all pled guilty. (Am. Compl., ¶¶ 76–78.)

An Affidavit filed in the criminal case describes the basis for the charges as

follows:

> [F]rom March 2017 to March 2020, [the criminal defendants, known as "Householder's Enterprise,"] received approximately $60 million from [FirstEnergy Corp.[2]] entities, paid through Generation Now and controlled by Householder and the Enterprise. In exchange for payments from [FirstEnergy], Householder's Enterprise helped pass House Bill 6, legislation described by an Enterprise member as a billion-dollar "bailout" that saved from closure two failing nuclear power plants in Ohio affiliated with [FirstEnergy]. The Enterprise then worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative. To achieve these ends, and to conceal the scheme, Householder's Enterprise passed money received from [FirstEnergy] affiliates through multiple entities that it controlled [including Generation Now and Coalition for Growth & Opportunity]. Householder's Enterprise then used the bribe payments to further the goals of the Enterprise, which include: (1) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of secret payments; (2) enriching and benefitting the enterprise, its members, and associates; and (3) concealing, and protecting purposes (1) and (2) from public exposure and possible criminal prosecution.

(Resp. Ex. 1, ¶ 9.) Mr. Longstreth admitted that Generation Now was used "as a

mechanism to receive undisclosed donations to benefit HOUSEHOLDER and to

advance HOUSEHOLDER's efforts to become Speaker of the Ohio House of

Representatives." (Am. Compl., ¶ 76.) Mr. Cespedes further admitted to

orchestrating payments to Generation Now "in return for specific official action by

Householder relating to the passage and preservation of" HB 6 and to defeat the

subsequent ballot initiative seeking its repeal. (*Id.*, ¶ 77.)

---

[2] Although identified by the pseudonym "Company A" in the Affidavit, FirstEnergy Corp. has since acknowledged its role in a Deferred Prosecution Agreement entered into with the United States Attorney's Office for the Southern District of Ohio. *United States v. FirstEnergy Corp.*, 1:21-cr-00086-TSB (S.D. Ohio, filed on July 22, 2021).

### D. AEP Lobbying

While HB 6 made its way through the General Assembly, AEP deployed significant resources advocating for the bill to include certain favorable provisions. AEP's Vice President of External Affairs, Tom Froehle, provided interested party testimony on the bill's initial draft on April 23, 2019 (Allen Decl. Ex. 18, ECF No. 29-20), sent a letter to the Ohio House expressing AEP's support for the then-current draft on May 22, 2019 (Allen Decl. Ex. 19, ECF No. 29-21), and provided written testimony to the Ohio Senate advocating re-inclusion of OVEC cost recovery into the bill on June 27, 2019 (Allen Decl. Ex. 6, ECF No. 29-8). In addition, all ten lobbyists employed by AEP from January through August 2019 filed statements disclosing "active advocacy" on HB 6 during that period. (Allen Decl. Ex. 14, ECF No. 29-16; Ex. 15, ECF No. 29-17; Ex. 16, ECF No. 29-18; Ex. 17, ECF No. 29-19.)

AEP also contributed to Empowering Ohio's Economy ("EOE"), a "social welfare" organization exempt from tax under 26 U.S.C. § 501(c)(4). (Am. Compl., ¶ 56.) Between 2015 and 2020, AEP contributed nearly $9 million to the organization. (*Id*.) AEP was the sole contributor to EOE and both Mr. Froehle and James B. Hadden ("an attorney who represented AEP in the past") served on its Board of Directors. (*Id*., ¶¶ 7, 56.) Notably, EOE contributed $200,000 to Coalition for Growth & Opportunity and $100,000 to Generation Now in 2017; $50,000 to Generation Now in 2018; and $550,000 to Generation Now in 2019. (*Id*., ¶ 57.) AEP did not publicly disclose its contributions to EOE before July 2020. [3] (*Id*., ¶¶ 13, 83.)

---

[3] Neither the Tax Code nor the Treasury Regulations establish an affirmative right for a 501(c)(4) contributor to remain anonymous. But, as a matter of practice,

### E.   Alleged False or Misleading Statements and Omissions

Plaintiffs allege that Defendants made the following "materially false and misleading statements" during the Class Period:

### 1.   Q1 19 Earnings Call

On the April 25, 2019 AEP earnings call, Mr. Tierney stated:

*Mr. Tierney's Prepared Remarks*

Now to the Ohio clean air fund legislation. The company is supportive of the Ohio House leadership's focus and efforts on addressing key energy policy issues that have plagued the state for years. In order for the legislation to benefit all Ohio customers, there are certain issues that must be addressed.

First, an elimination of the renewable portfolio standard should be replaced with the opportunity for utilities to voluntarily develop economic renewable resources in the state. In addition, contracts entered into under the existing renewable portfolio standard must be grandfathered so as to not punish utilities who are compliant with Ohio law.

Second, in regards to energy efficiency. AEP is concerned about a rapid elimination of EE programs that have benefited our customers for many years. In lieu of immediate elimination of EE programs, previously approved plans should be phased out over the next several years. We look forward to working with lawmakers during the process to achieve a balanced energy bill that provides benefits to all Ohio customers.

(*Id.*, ¶ 54.)

---

the structure affords contributors with a level of privacy. Before May 27, 2020, all 501(c)(4) organizations were required to report to the IRS contribution amounts, along with names and addresses of substantial (> $5,000) contributors, on the Form 990, Schedule B, *see* 26 C.F.R. § 1.6033-2(a)(2)(ii)(f), but the Scheduled B was not made public. (As of May 27, 2020, 501(c)(4) organizations are no longer required to report substantial contributors' names and addresses.) Nonetheless, 501(c)(4) organizations are one of a number of groups referred to in the campaign finance realm as "dark money" groups. *See* Daniel P. Tokaji & Renata E. B. Strause, The New Soft Money: Outside Spending in Congressional Elections, at 51 (2014), archived at http://perma.cc/7HNN-S2LX.

*Response to Analyst Questions*

Analyst:

And then with respect to the Ohio legislation, previously, you guys, I think, had concerns about AEP utility ratepayers paying for other companies' nuclear plants. How do you guys feel about HB 6 as it currently stands? I mean I know you raised a couple of the issues in your prepared remarks this morning. Can you just give a little more color on that?

Mr. Tierney:

So we think if there's a full package where all of Ohio customers can benefit, then it's a worthy effort. If it's just a bailout for one company or another, it's not as beneficial to all Ohio customers. So there needs to be a full package of things that get addressed. And energy efficiency, the renewable portfolio standard, ability of utilities to invest in renewables going forward are all important things that need to be in the bill. And if they're not, it's not as beneficial for ratepayers in the state.

(*Id.*, ¶ 55.)

Plaintiffs allege that Mr. Tierney "concealed that the primary driver for AEP's lack of support for HB6 (as introduced in the House on April 12, 2019) was the lack of any cost-recovery provision governing AEP's own coal-fired plants." (*Id.*, ¶ 56.) In other words, that AEP "was not concerned about 'a bailout for one company' . . . provided that it too was included in that bailout." (*Id.*) Plaintiffs further allege that Mr. Tierney "concealed that Defendants were violating AEP's own policy [on Corporate Political Contributions] to secure cost-recovery for its coal-fired plants" by making "substantial contributions to Householder's criminal enterprise . . . through its EOE non-profit[.]" (*Id.*)

## 2. 2019 Corporate Accountability Report

On May 9, 2019, AEP published its annual Corporate Accountability Report, which included the following:

**Lobbying and Political Contributions**

\* \* \*

The investments needed to modernize the power grid are in the billions of dollars, and the stakes have never been higher. ***To understand the policies and regulations that could affect our business, we participate in a number of organizations, lobby on our customers' behalf and contribute to political candidates, where allowed by law.***

***Each year, AEP publicly discloses lobbying activities and political contributions.*** We also annually report on the portions of membership dues paid to organizations such as the U.S. Chamber of Commerce and Edison Electric Institute (EEI) that go toward lobbying. We post our lobbying policy online and we discuss political contributions annually with AEP's Board of Directors' Committee on Directors and Corporate Governance.

\* \* \*

***We believe in transparency and active participation in public debate. Our experience is that open, candid discussion and a good-faith attempt to reach common ground is the best way to do business.***

(*Id.*, ¶ 58) (emphasis in original).

In Plaintiffs' view, these statements "were materially false and misleading when made." (*Id.*, ¶ 59.) Plaintiffs allege that, by "secretly contributing $900,000 to Householder's criminal enterprise, which funded Householder and political candidates aligned with Householder who would support HB6[,]" AEP was not transparent about its political contributions—and was not engaging in that conduct for the stated purpose of "understand[ing] the policies and regulations that could affect [its] business[.]" (*Id.*)

### 3. Q2 19 10-Q

AEP filed its 10-Q for the second quarter of 2019 on July 25, 2019. It stated, in part:

> In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero- or reduced carbon emissions was signed into law by the Ohio Governor. The clean energy legislation phases out current energy efficiency and renewable mandates after 2020 and 2026, respectively. The bill also provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032 and includes a provision for recovery of certain legacy generation resources which will be allocated to all electric distribution utilities on a non-bypassable basis. ***Management is analyzing the impact of this legislation and at this time cannot estimate the impact on results of operations, cash flows or financial condition.***

(*Id.*, ¶ 60) (emphasis in original).

Plaintiffs allege that these statements were materially false and misleading. (*Id.*, ¶ 61.) First, because "AEP, in fact, was able to estimate the impact of the legislation on its financial results, at least with respect to coal-fired cost recovery" and that "[d]ocuments uncovered in governmental investigations demonstrate that AEP actually calculated how HB6 would impact AEP's financial performance[.]"(*Id.*) And second, because the statements "created the misleading impression that AEP was not behind HB6's cost-recovery provisions, when in fact it was a driving force of the amendment that brought coal-fired cost recovery into HB6." (*Id.*)

### 4. Q2 19 Earnings Call

AEP held its second quarter earnings call on the same day the 10-Q was filed. Mr. Akins gave the following prepared remarks on that call:

> ***Now onto the next hot issue, the Ohio House Bill 6 legislation.*** Governor DeWine earlier this week signed legislation that will provide support to the nuclear units in Ohio as well as support for the OVEC

generating units. While the legislation phases out the RPS mandate after 2026, it still provides benefits for the recovery of existing renewable contracts until 2032 and provides additional support for solar projects that have already received signing approval, including our 400 megawatts of proposed solar project, which can also collect from the same clean energy fund as the nuclear units.

***So to reiterate, as far as AEP is concerned, we see positives from this legislation for us, namely recovery of OVEC collected – that's collected on a statewide basis through 2030.*** Secondly, recovery of our existing renewable contracts entered into to comply with previous legislation and approved by the P[U]CO. The opportunity for AEP Ohio to enter into bilateral contracts with certain customers. This one is an important issue for AEP as we have had specific requests from various customers for AEP Ohio to be the provider of renewable resources in addition to being the wires provider.

And fourth, the ability for solar projects that have siting board approval to access the $20 million of the clean air funds, which includes the 400 megawatts of solar that we now have before the P[U]CO. The access to these funds make these particular projects even more beneficial for customers and, as you recall, the request for these projects include a $6 million per year debt equivalency rider to maintain AEP Ohio's capital structure.

And finally, the net impact of HB 6 will provide headroom to our rate payers, which will enable potential additional distribution investments to improve the customer experience and grid reliability.

AEP does believe in the importance of nuclear generation as a part of the portfolio of this country and the State of Ohio. ***We congratulate Speaker Householder; Senate President Obhof; Governor DeWine; Lieutenant Governor Husted and Chairman Randazzo***, along with many other members of the Ohio legislature in balancing the interest of a need for a balanced portfolio, employment and economic development issues and customer benefits.

(*Id.*, ¶ 62) (emphasis in original).

Plaintiffs allege that these statements "were misleading and omitted material information." (*Id.*, ¶ 63.) Specifically, they "created the impression that the legislation was drafted and passed pursuant to a legitimate process when, in truth,

11

the process was corrupted and designed to benefit AEP and other energy companies to the detriment of ratepayers." (*Id*.) Plaintiffs further allege that the statements "created the false impression that AEP was merely a distant beneficiary of the bill, when, in truth, AEP was actively involved in getting the bill passed[.]" (*Id*.)

### 5.   AEP Regulatory Newsletter

The next month, AEP published a regulatory newsletter, which included the following:

**What is Ohio's HB 6?**

When initially introduced, the purpose of the legislation was for all Ohio electricity customers to pay to keep open Lake County's Perry and Ottawa County's Davis-Besse nuclear plants, owned by FirstEnergy Solutions (FES), a subsidiary of FirstEnergy Corp. ***However, the goal of the legislation expanded to support additional renewable energy resources while eliminating certain utility energy efficiency activities and renewable portfolio compliance standards.*** The expansion to HB 6 came with the expectation that distribution charges would be reduced by eliminating the energy efficiency rider charge while promoting clean air resources.

On July 24, 2019, Ohio Governor Mike DeWine signed into law HB 6 . This law creates the Nuclear Generation Fund and the Renewable Generation Fund, to be administered by the Ohio Air Quality Development Authority. These funds allow for a "qualifying nuclear resource" or a "qualifying renewable resource" to be eligible for participation in the programs for one or more program years, as determined by the Authority.

\* \* \*

**What are the details of each provision in HB 6?**

\* \* \*

***Renewable Funding Opportunity***

HB 6 supports eligible solar facilities over 50MW that already have siting certification as of June 2019. ***AEP Ohio has two eligible solar renewable facilities located in Highland County.*** These are the Willowbrook project (100MW) and the Hecate project (300MW).

12

*Through the renewable funding opportunity, a $9 per MWh credit is paid to project owners of eligible solar facilities for a total of $20 million annually, which covers about 1,000MW of solar.* This credit is assessed from the $20 million renewable portion of the Clean Air Fund as described above.

*OVEC Statewide Recovery*

The Ohio Valley Electric Corporation (OVEC) and the Indiana-Kentucky Electric Corporation (IKEC) are generating stations originally built in the 1950s and provided electric power for the U.S. Department of Energy's uranium enrichment facilities then near Portsmouth, Ohio. Today, OVEC and IKEC own two coal power plants; Kyger Creek Generating Station (1.1GW) in Cheshire, Ohio and Clifty Creek Generating Station (1.3GW) in Madison, Indiana. Under HB 6, OVEC and IKEC will receive subsidies to support their coal-fired power plants.

*Effective January 1, 2020, distribution customers throughout Ohio will incur a non-bypassable charge, called the Purchased Power Agreement (PPA) Rider. The rider for residential customers is $1.50 per month. Commercial and industrial customers' monthly charge is $1,500 for this rider.* The PPA Rider will begin in 2021 and will be reviewed by the Commission every three years to determine continuation of the rider, which is to end December 31, 2030.

*Reduced Renewable Portfolio Standards*

In 2008, the State of Ohio established their Renewable Portfolio Standards (RPS) policy. This policy required providers selling electricity to consumers to provide a specific percentage of that supply from renewable sources. Currently, the RPS policy states 12.5% of your electricity must come from renewable energy sources by 2027, with 0.5% required to be solar.

*HB 6 reduces the RPS target for utilities and competitive retail energy suppliers to 8.5%, and the solar portion is eliminated by December 31, 2026.* This means that most Ohio customers will see a price reduction by the elimination of RPS requirements effective January 1, 2027. *However, an AEP Ohio customer should read the section below on the AEP Ohio bypassable renewable legacy charge, as you will continue to receive this charge through 2032.*

(*Id.*, ¶ 65) (emphasis in original).

13

### *Potential Referendum on Ohio HB 6*

Groups are forming a campaign to add a referendum on the November 2020 ballot to repeal HB 6. Opponents include environmental groups opposed to the elimination of energy efficiency programs and developers of natural gas-fired power plants opposed to the subsidy for nuclear generation. These groups are circulating a petition, seeking 1,000 signatures from registered Ohio voters in hopes of adding a referendum to the 2020 election.

The petition was approved by the Ohio Attorney General David Yost on August 29, 2019. ***The next step opponents will take is to obtain approximately 266,000 additional signatures to place the petition on the November 2020 ballot for a vote.*** Finally, a majority vote is needed to approve the petition for the repeal of HB 6.

***Meanwhile FES [FirstEnergy Solutions Corp., now Energy Harbor Corp.] filed a challenge to the petition with the Supreme Court of Ohio on September 4, stating HB 6 is a tax and tax laws are exempt from referendums.***

This petition process will take a long time before being resolved and may create market uncertainty for everyone at each step of the process. This uncertainty may impact energy supply plans and strategies for all involved.

(*Id.*, ¶ 66) (emphasis in original).

Plaintiffs allege that the statements in AEP's regulatory newsletter were "materially false and misleading" because they "concealed that AEP was a driving force behind the coal-fired cost recovery provisions in HB6, including its involvement with Householder associates, its contributions to Householder to support passage of HB6, and its contributions to fund opposition to the referendum." (*Id.*, ¶ 67–68.)

### 6.     Q3 19 10-Q and 2019 10-K

AEP's third quarter 2019 10-Q filing stated:

> In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero or reduced carbon emissions was signed into law by the Ohio Governor. The clean energy legislation phases out current energy efficiency and renewable mandates no later than 2020 and after 2026, respectively. The bill provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032. ***The clean energy legislation also includes a provision for recovery of OVEC costs through 2030 which will be allocated to all electric distribution utilities on a non-bypassable basis.*** OPCo's Inter-Company Power Agreement for OVEC terminates in June 2040. To the extent that OPCo is unable to recover the costs of renewable energy contracts on a bypassable basis by the end of 2032, recover costs of OVEC after 2030 or fully recover energy efficiency costs through 2020 it could reduce future net income and cash flows and impact financial condition.

(*Id.*, ¶ 69) (emphasis in original). Similarly, AEP's 10-K filed for 2019 stated:

> ***In January 2020, provisions enacted as part of Ohio Am. Sub. H.B. 6 went into effect that replace the PPA rider and enable OPCo to continue recovering the net cost associated with the ICPA [Inter-Company Power Agreement], including any additional contractual entitlement received as a result of the FirstEnergy Solutions (FES) bankruptcy, through 2030.***

(*Id.*, ¶ 70) (emphasis in original).

Plaintiffs broadly allege that the statements in the Q3 19 10-Q and 2019 10-K "were materially false and misleading when made" because "Defendants fraudulently concealed that: (a) AEP was actively involved in funding the passage and defense of HB6 through its EOE non-profit, which allowed AEP to advance its political interests and advocate for HB6 in the dark; (b) between 2017 and 2019 AEP secretly funneled through its dark money alter ego EOE $900,000 to Generation Now and Coalition to fund the passage of HB6, including contributions to political candidates aligned with Householder; (c) EOE's contributions to

Generation Now increased ten-fold from $50,000 in 2018 to $550,000 in 2019, the year HB6 became law, which clearly linked AEP's contributions to HB6's coal-fired cost recovery amendments; and (d) these contributions violated AEP's internal policy" regarding Corporate Political Contributions. (*Id.*, ¶ 71.)

### 7. 2020 Corporate Accountability Report

Finally, AEP published its 2020 Corporate Accountability Report on May 20, 2020. That release included the following:

> At AEP, we never have been more certain of our responsibility to a sustainable future for our customers, communities and employees. We will continue to take steps to reduce our carbon footprint, to empower customers and to value and develop our workforce. Together, our energy and future are truly boundless.
>
> * * *
>
> **Public Policy & Issue Management**
>
> Similar to other companies, AEP has a public policy strategy that seeks to inform decisions made by Congress, the Federal Energy Regulatory Commission (FERC), North American Electric Reliability Corporation (NERC), state legislatures and regulatory commissions, and Regional Transmission Organizations (RTOs).
>
> AEP's Policy Advisory Team (PAT), consisting of senior executives across all business functions and departments, considers policy options on issues of relevance to the company and supports internal policy analysis and debate. This approach ensures that AEP is speaking with one voice and that all employees with external contacts are clear on our policy positions and objectives. Since its inception in May 2017, the PAT has reviewed more than two dozen issues, including 13 in 2019.
>
> * * *
>
> **Climate & Lobbying**
>
> Some stakeholders are asking AEP whether our lobbying practices and the policy positions taken by trade organizations to which we belong are in alignment with the Paris Climate Agreement. ***We believe in transparency and active participation in public policy***

16

***development, regardless of the issue or position.*** Moreover, AEP is a respected and sought-after voice when it comes to energy policy-related matters in the U.S.

***We report on our public policy positions, annual lobbying and political contributions, policy on political contributions and trade association memberships.*** We post our lobbying policy online and have consistently acknowledged our intent to participate actively in the political process and in lobbying activities at the national, state and local levels. At AEP, we must consider a number of factors when engaging in this arena, as public policy develops through negotiation and compromise. While many divergent issues are of importance to us, we cannot invest all of our efforts to focus on a single issue. We are obligated to deliver safe, reliable, affordable and secure electricity to all of our customers, and we develop our public policy positions with that in mind.

(*Id.*, ¶ 72) (emphasis in original).

Here, Plaintiffs reiterate their allegation that AEP was not transparent about "its involvement in the HB6 legislation, its opposition to the referendum, and certainly did not disclose the dark money contributions that it made to (and through) EOE." (*Id.*, ¶ 73.)

## F.    Columbus Dispatch Article

On Saturday, July 25, 2020, The Columbus Dispatch published an article titled *Columbus Utility Giant AEP Funded Dark Money Spending in HB 6 Campaign.*[4] Plaintiffs allege that, through this article, "Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market[.]" (Am. Compl., ¶ 95.) The article is reproduced here in full, with emphasis as reflected in the Amended Complaint:

***A dark-money group wholly funded by House Bill 6 beneficiary and Columbus utility giant American Electric Power contributed***

---

[4] The article was published on the front page of the paper's July 26, 2020 print edition under the headline *To Boost H.B. 6, AEP Gave 350K in 'Dark Money'.*

*$350,000 toward the campaigns now at the center of a racketeering and bribery case that ensnared House Speaker Larry Householder, an investigation by The Dispatch finds.*

*Empowering Ohio's Economy Inc., a nonprofit operated solely with AEP funds, gave $150,000 to Generation Now, another dark-money group* that received $60 million from FirstEnergy-related interests to ensure passage and survival of a $1 billion ratepayer bailout of a subsidiary's pair of nuclear power plants.

Empowering Ohio also gave $200,000 to the Coalition for Opportunity & Growth, which is related to a similarly named political action committee that spent $1 million in the 2018 campaigns of Householder-favored Republican candidates to help ensure that he had their votes to become speaker.

*An affidavit filed by an FBI agent in the racketeering case details spending of $350,000 by an unidentified "interest group that was funded exclusively by $13 million from another energy company that supported HB 6."*

*A source close to the investigation confirmed to The Dispatch that the energy company is American Electric Power*, a publicly traded company that serves 5.5 million customers in 11 states and earned $2.1 billion last year.

The "social welfare" nonprofit is not required to disclose its donors or the source of its funding.

The board of Empowering Ohio's Economy – which approved the H.B. 6-related spending – includes AEP's top lobbyist, one of Republican Householder's predecessors as House speaker, a former congressman and a friend of Republican Gov. Mike DeWine.

AEP spokesman Scott Blake said the utility has not been contacted by investigators "and none of the wrongful conduct in the criminal complaint involves AEP or its subsidiaries. Neither AEP nor any of its subsidiaries made any contributions to Generation Now."

The utility gives to a variety of social welfare nonprofits, including Empowering Ohio's Economy, to support its mission of promoting economic and business development and education programs, he said. AEP does not comment on specific contributions or amounts, he added.

18

"These contributions were done appropriately, and we have every reason to believe that the organizations we support have acted in a lawful and ethical manner," Blake added.

***AEP benefited from the passage of House Bill 6 with its six-year-plus extension through 2030 of a monthly surcharge of up to $1.50 on Ohio electricity customers. The fee generates about $50 million a year to subsidize a pair of old coal-burning power plants it partly owns in a consortium with other utilities.***

The plants – Kyger Creek near Cheshire, Ohio, and Clifty Creek near Madison, Indiana – were built in the mid-1950s to supply electricity to the former uranium-enrichment plant near Piketon, Ohio. ***AEP owns the biggest stake in the coal plants at 43% and buys about 60% of the electricity generated by the plants.***

The board of directors of Empowering Ohio's Economy includes Thomas Froehle, vice president of external affairs for AEP – its top lobbyist. He testified before the General Assembly in support of House Bill 6. AEP registered 23 lobbyists to work the 132 lawmakers to pass the legislation last year.

A message seeking comment was left with Froehle. AEP confirmed he remains a board member.

Other board members include former Republican House Speaker Jo Ann Davidson; former U.S. Rep. David Hobson, R-Springfield; and J.B. Hadden, a lawyer who has represented AEP and a friend to DeWine. Hadden, president of the nonprofit's board, was treasurer of DeWine's 2014 attorney general re-election campaign.

"I don't know what they were up to," Hadden said of Generation Now and Coalition for Opportunity & Growth, adding he did not recall which board member sought the funding. He said he never discussed the matter with DeWine.

While he did not have access to records, Hadden disputed the nonprofit received $13 million in funding as listed in the FBI affidavit. The group's IRS filings show it received $8 million total in 2015 and 2016, with no contributions in 2017–18. It listed a year-end cash balance of nearly $3.9 million in 2018. Prior IRS tax forms, and the 2019 filing, are not available online.

The group's address is listed as the Downtown office of Davidson, who serves as secretary-treasurer. A working telephone number for Hobson could not be located. Board members receive no compensation.

19

*The Coalition for Opportunity & Growth, the independent-expenditure political action committee which received $200,000 from the AEP dark-money group in 2017, the dark-money Coalition & Opportunity PAC that backed Householder candidates and Generation Now* all were incorporated by Eric Lycan, a lawyer and Republican consultant in Lexington, Kentucky.

While not identified in the affidavit, the Coalition for Opportunity & Growth cash went largely unused until early this year, when it went out to support Householder-blessed candidates in the GOP primary, the FBI affidavit said.

*It was laundered through the related PAC to conceal its association with Generation Now, the FBI affidavit states: "Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it."*

The FBI affidavit said FirstEnergy interests provided $390,000 to the group, which paid $54,000 to Generation Now, $191,000 to a media-placement firm, $200,000 to a public relations firm and $100,000 to JPL & Associates, a firm controlled by Jeff Longstreth, Householder's top political aide. Longstreth is among those arrested and facing up to 20 years in prison if convicted in the H.B. 6 case.

Despite those amounts, the Coalition for Opportunity & Growth reported spending only $102,835 in its filings with the Federal Election Commission.

Empowering Ohio's Economy spent $3.7 million between 2016 and 2018 on a variety of charitable and civic endeavors. Its biggest expenditure of $750,000 went to the host committee of the Republican National Convention in Cleveland in 2016.

It also gave $300,000 to the Capitol Square Foundation, of which Davidson is a board member and which benefits the Statehouse, and $250,000 to Two Paths America, a nonprofit created amid former GOP Gov. John Kasich's 2016 presidential run to promote his positions.

Householder and four others were arrested Tuesday following an FBI investigation that captured phone calls, text messages and recordings of meetings centering around *the alleged pay-to-play scheme described by U.S. Attorney Dave DeVillers as the largest public corruption case in Ohio history.*

20

Randy Ludlow, *Columbus Utility Giant AEP Funded Dark Money Spending in HB 6 Campaign*, THE COLUMBUS DISPATCH (July 25, 2020, 12:22 PM), https://www.dispatch.com/story/news/politics/state/2020/07/25/columbus-utility-giant-aep-funded-dark-money-spending-in-hb-6-campaign/41843419/. (*See also* Am. Compl., ¶ 74.)

Plaintiffs allege that the article also contained the following[5]:

American Electric Power's political action committee contributed nearly $672,000 to Ohio politicians and parties between 2016 and mid-2020, including $17,250 to Householder and $86,792 to the House Republican's campaign account.

Empowering Ohio's Economy spent $162,500 on lobbying between 2016 and 2018, according to its tax filings. ***The group was not registered with the state as attempting to influence legislation.***

(Am. Compl., ¶ 74.)

On the day following publication of the article, "AEP shares fell $4.67 per share, or other 5%, to close at $81.16 per share . . . on unusually heavy trading volume, damaging investors." (*Id.*, ¶ 75.)

### G.    Oral Argument

Based only on the Amended Complaint and other written submissions to the Court, it is unclear whether Plaintiffs' claims are based on Defendants' failure to disclose <u>bribes</u> made in connection with HB 6, or simply a failure to disclose the full

---

[5] On the Court's review, these statements do not appear in the online or print editions of The Columbus Dispatch article. However, they do appear in a July 27, 2020 re-publication of the story in Oklahoma Energy Today. *See AEP's Dark Money Group Contributed to Campaigns of Arrested Ohio Leaders*, OKLAHOMA ENERGY TODAY (July 27, 2020), http://www.okenergytoday.com/2020/07/aeps-dark-money-group-contributed-to-campaigns-of-arrested-ohio-leaders/.

extent of AEP's legitimate lobbying efforts on the bill. For example, the Amended Complaint states, in part:

> AEP was operating and advancing its own political interests in its coal-fired plants by secretly contributing $900,000 to Householder's criminal enterprise, which funded Householder and political candidates aligned with Householder who would support HB6. Thus, at the same time that they were emphasizing "transparency," AEP was working through its dark money alter ego to circumvent its own policy emphasizing that "'AEP cannot lawfully make Corporate Political Contributions to candidates for elected office in . . . Ohio . . . .'"

(*Id.*, ¶ 59.) This paragraph first seems to accuse AEP of the same bribery scheme in which FirstEnergy engaged—but the second sentence walks that back substantially, and characterizes the conduct only as a violation of AEP policy.

Similarly, the Amended Complaint repeats the allegation that Defendants:

> fraudulently concealed that: (a) AEP was actively involved in funding the passage and defense of HB6 through its EOE non-profit, which allowed AEP to advance its political interests and advocate for HB6 in the dark; (b) between 2017 and 2019 AEP secretly funneled through its dark money alter ego EOE $900,000 to Generation Now and Coalition to fund the passage of HB6, including contributions to political candidates aligned with Householder; (c) EOE's contributions to Generation Now increased ten-fold from $50,000 in 2018 to $550,000 in 2019, the year HB6 became law, which clearly linked AEP's contributions to HB6's coal-fired cost recovery amendments; and (d) these contributions violated AEP's internal policy stating that "'AEP cannot lawfully make Corporate Political Contributions to candidates for elected office in . . . Ohio[.]'"

(*Id.*, ¶¶ 61, 64, 67, 71, 73.) Items (a)–(c) walk right up to the line accusing AEP of bribing an elected official; but, again, (d) walks it back to that company policy.

At oral argument, Plaintiffs clarified, in no uncertain terms:

> **THE COURT:** . . . Are you alleging that AEP's contributions to EOE, Empowering Ohio's Economy, that they constituted bribery or are you saying that it's . . . AEP's failure to follow the company policy on transparency that is the basis for your claim? . . .

**MR. ALVAREZ:** So for many years, Your Honor, AEP had been trying to seek a bailout for the two coal-fired plants that it owned. . . . And it . . . tried to do it by legitimate means. . . . It tried to get . . . subsidies from the Ohio . . . rate payers. It talked to FERC. It talked to PUCO. Didn't happen. So what did it do then? It went through the legislative means. It tried that, as . . . HB 239, to get the bailout. That didn't work either. So there was nothing left for AEP, for Akins or Tierney, to do. The only thing that they had left to do was a nefarious option: Pay to play with Householder. And that's where the bribery comes in. . . .

**THE COURT:** So you are alleging that AEP engaged in bribery?

**MR. ALVAREZ:** Yes[.]

(ECF No. 38, 5:21–23.) Accordingly, the Court interprets Plaintiffs' claims, in its consideration and analysis, as alleging that Defendants engaged in a scheme of bribery.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted).

Courts are typically limited to deciding Rule 12(b)(6) motions on the complaint. When claims are grounded in the Exchange Act, however, a court "may consider the full text of the SEC filings, prospectus, analysts' reports and statements integral to the complaint, even if not attached, without converting the motion into one for summary judgment under Fed. R. Civ. P. 56." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001) (internal quotations omitted).

A securities fraud claim must satisfy the heightened pleading standards delineated under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Pursuant to Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA further requires that the plaintiff "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2).

## III.    ANALYSIS

### A.    Count One fails to state a claim for securities fraud.

Section 10(b) of the Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of

24

investors." 15 U.S.C. § 78j(b). The statute implies a private cause of action to

purchasers of securities. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552

U.S. 148, 157 (2008). SEC Rule 10b-5 forbids "the making of any 'untrue statement

of a material fact' or the omission of any material fact 'necessary in order to make

the statements made . . . not misleading.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S.

336, 341 (2005) (quoting 17 C.F.R. § 240.10b-5). Together, § 10(b) and Rule 10b-5

"have the effect of prohibiting the commission of fraud in connection with the sale or

purchase of securities." *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir.

1997).

> To state a claim for securities fraud, a plaintiff must allege:
>
> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383–84

(6th Cir. 2016) (internal quotations omitted). Here, Defendants argue that the

Amended Complaint is deficient for three independent reasons: first, that the

alleged misrepresentations or omissions are not actionable under the PSLRA;

second, that Plaintiffs do not adequately allege that Defendants acted with the

requisite mental state (scienter); and third, that Plaintiffs fail to adequately allege

loss causation. Because Defendants' first argument is well-taken and dispositive,

the Court need not and does not address scienter or loss causation.

A plaintiff successfully pleads an actionable misrepresentation or omission

when he alleges facts demonstrating: "(1) that a defendant made a statement or

omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare, Inc. Sec. Litig.* ("*Omnicare III*"), 769 F.3d 455, 470 (6th Cir. 2014). While seemingly straightforward, courts "must apply a different analytical framework to cases based on affirmative misrepresentations, as opposed to omissions" and "different rules apply when the misrepresentation or omission concerns hard, as opposed to soft, information." *Id.*

> An actionable misrepresentation is:
>
> an affirmative statement that is misleading or false. When an alleged misrepresentation concerns hard information—typically historical information or other factual information that is objectively verifiable— it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading. When an alleged misrepresentation concerns soft information, which includes predictions and matters of opinion, a plaintiff must additionally plead facts showing that the statement was made with knowledge of its falsity[.]

*Id.* (internal quotations and citations omitted). When reviewing alleged misrepresentations of "soft information," the Sixth Circuit first evaluates the materiality and whether the statement was misleading or false, and saves subjective inquiry for the scienter analysis. *Id.* at 471 (citing *In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 48–49 (1st Cir. 2005), overruled on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).

An actionable omission, on the other hand, is a defendant's "failure to disclose information when it had a duty to do so." *Id.* "[I]t bears emphasis that § 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all . . . information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Instead,

> [a] duty to affirmatively disclose may arise when there is insider trading, a statute requiring disclosure, or . . . an inaccurate, incomplete[,] or misleading prior disclosure. To complicate matters further, when a person or corporation comes into possession of information that makes a prior statement inaccurate, incomplete, or misleading, different duties to disclose the new information arise, perhaps unsurprisingly, depending on whether the new information is hard or soft. If the new information is hard, then a person or corporation has a duty to disclose it if it renders a prior disclosure objectively inaccurate, incomplete, or misleading. If the new information is soft, then a person or corporation has a duty to disclose it only if [it is] virtually as certain as hard facts and contradicts the prior statement.

*Omnicare III*, 769 F.3d at 471. The Sixth Circuit has explained, "the new information must be so concrete that the defendant must have actually known that the new information renders the prior statement misleading or false and still did not disclose it." *Id.* "A company is also obligated, once it chooses to speak on a subject, to do so fully and fairly[.]" *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 700 (E.D. Mich. 2010). "Our securities laws therefore require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005) (internal quotations omitted).

To be actionable, misrepresentations and omissions must also relate to *material* facts. "Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *In re Sofamor Danek*, 123 F.3d at 400 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). Omitted information is immaterial if it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its]

unimportance." *City of Monroe*, 399 F.3d at 680 (internal quotations and emphasis omitted).

"'Immaterial statements include vague, soft, puffing statements or obvious hyperbole' upon which a reasonable investor would not rely." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (quoting *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002)). "Courts have consistently found immaterial a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important." *Indiana State Dist. Council of Laborers & Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.* ("*Omnicare I*"), 583 F.3d 935, 944 (6th Cir. 2009). Still, the Sixth Circuit warns that courts "must tread lightly at the motion-to-dismiss stage, engaging carefully with the facts of a given case and considering them in their full context," when considering materiality. *Omnicare III*, 769 F.3d at 472.

The Court "undertake[s] a statement-by-statement analysis" according to this framework. *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015).

### 1.    Q1 19 Earnings Call

Defendants argue that Mr. Tierney's comments made on the Q1 19 Earnings Call are not actionable under the PSLRA. For different reasons as to each alleged deficiency, the Court agrees.

First, Plaintiffs allege that AEP "concealed" the real reason why it withheld support for the initial draft of HB 6—that it did not include OVEC cost recovery.

28

But, as even the Amended Complaint makes clear, OVEC cost recovery was a visible priority for AEP in the decade leading up to HB 6's introduction. (Am. Compl., ¶¶ 40–52.) For example, Mr. Akins stated publicly in 2017 that the company was "looking for permanent support of the PPA that provides OVEC generation to AEP Ohio customers." (*Id.*, ¶ 50.) That same year, AEP supported legislation that "would provide nearly $256.6 million in subsidies to the OVEC Plants" over the remaining term of the ICPA. (*Id.*, ¶ 52.) As a result, Mr. Tierney's express reference to OVEC cost recovery on the Q1 19 Earnings Call would not have significantly altered the total mix of information then available to investors. In other words, the alleged omission was not material.

As to the allegation that AEP "concealed" that it was bribing Speaker Householder to obtain OVEC cost recovery, Mr. Tierney's comments on the Q1 19 Earnings Calls were "too generic and innocuous" to be actionable on that basis. *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 767 (N.D. Ohio 2020). The Court simply does not accept the notion that such "vague and generic" statements created any impression that could, or would, have misled a reasonable investor to believe that AEP *was not* engaged in the criminal bribery scheme that Plaintiffs allege. *Id.*, citing, *inter alia*, *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 573–74 (6th Cir. 2008) and *City of Monroe*, 399 F.3d at 671. Nor does the Court find that those statements gave rise to a duty to disclose any such scheme. *Id. See also In re Sofamor Danek*, 123 F. 3d at 402 (explaining that "[t]he legality of

29

[defendant's] support for [a] non-profit foundation . . . was a matter of opinion—'soft information'") (internal quotation and citation omitted).

### 2. Q2 19 10-Q

The Q2 19 10-Q and Q2 Earnings Call are similarly inactionable under the PSLRA. The Q2 19 10-Q set out a factual explanation of HB 6 and a generic statement that management "is analyzing the impact" of the newly passed legislation. On the Q2 Earnings Call, Mr. Akins described the bill, highlighted five "positives from th[e] legislation for [AEP]," and "congratulate[d]" Speaker Householder and others for its passage. None of these statements misrepresents or omits material information.

Plaintiffs allege that the Q2 19 10-Q was false and misleading because AEP had in fact calculated the impact of OVEC cost recovery on its business and "thus created the misleading impression that AEP was not behind HB6's cost recovery provisions." (Am. Compl., ¶ 61.) But no reasonable investor would draw such an impression from the mere deferral of an opinion on how a piece of legislation impacting more than 30 separate provisions of the Ohio Revised Code governing a company's core business and signed into law only two days prior would impact a company's operations or financial position. (*See* ECF No. 29-9.) Plaintiffs similarly allege that the Q2 Earnings Call "created the false impression that AEP was merely a distant beneficiary of the bill when, in truth, AEP was actively involved in getting the bill passed[.]" (*Id.*, ¶ 63.) Contrary to Plaintiffs' allegations, AEP lobbied on HB 6—and the OVEC cost recovery provision—in broad daylight. As noted in the

Amended Complaint, AEP's Vice President of External Affairs testified in favor of that provision shortly before the bill passed. (*See id.*, ¶ 90(c).)

Plaintiffs further allege that Defendants "fraudulently concealed" bribery and corruption in the Q2 19 10-Q and Q2 Earnings Call. As above, statements so vague, generic, and innocuous as those identified did not create any impression about the legitimacy of AEP's lobbying activities on HB 6 or a duty to disclose the alleged illegitimate ones. *In re TransDigm*, 440 F. Supp. 3d at 767.

### 3. Regulatory Newsletter, Q3 19 10-Q, and 2019 10-K

The allegedly offensive statements made in AEP's Regulatory Newsletter, Q3 19 10-Q, and 2019 10-K "can be cast aside with little fanfare[.]" *Bondali*, 620 F. App'x at 491. They simply describe the provisions of HB 6 as signed into law and, in the case of the regulatory newsletter, the repeal referendum efforts underway. There is no allegation that the descriptions are factually inaccurate. Accordingly, the statements are neither false nor misleading. *See id.* (concluding that defendant "did not commit any misstatement by simply explaining that because sales were lower, projections would be lower").

### 4. Corporate Accountability Reports

Finally, Defendants argue that the Corporate Accountability Reports are "textbook" puffery, inactionable under the PSLRA. The Court agrees. The statements excerpted contain corporate-speak "so banal and ubiquitous" that a reasonable investor would rely no more on their content than on a glossy brochure of toothy grins and erect thumbs. *See Omnicare I*, 583 F.3d at 944. *See also In re TransDigm*, 440 F. Supp. 3d at 764 (finding statements about "value," "strength,"

31

and "quality" to be "[un]tethered to any kind of objective standard" and "so lacking in specificity that no reasonable investor could have found them important in the 'total mix' of information"). Plaintiffs argue that their reference to a "belief in transparency" and "public[] disclos[ure of] lobbying activities and political contributions" imposed an obligation on AEP to disclose its contributions to EOE. (*See* Resp., 10–13.) In context, however, those statements are more akin to "a declaration of corporate aspirations," which cannot form the basis of a claim under the PSLRA. *Bondali*, 520 F. App'x at 490 (finding that corporate policy on food safety was not actionable because it was "a statement of aspiration made in [defendant's] corporate Code of Conduct rather than an assertion of objective fact").

Defendants' motion to dismiss Count One is **GRANTED**.

### B.    Count Two fails to state a claim for control person liability.

In Count Two of the Amended Complaint, Plaintiffs assert a claim against the Individual Defendants under Section 20(a) of the Exchange Act. To plead such a claim, the plaintiff must allege facts "demonstrating that the defendant controlled another person who committed an underlying violation of the [Exchange] Act, and that the defendant culpably participated in that underlying violation." *In re Transdigm*, 440 F. Supp. 3d at 773 (internal quotations and emphasis omitted). Because Plaintiffs failed to plead a primary violation of the Exchange Act, Count Two must also be dismissed. *Id.*

Defendants' motion to dismiss Count Two is **GRANTED**.

**C.      The Amended Complaint will be dismissed with prejudice.**

Under Sixth Circuit precedent, "allowing repeated filing of amended complaints would frustrate the purpose of the PSLRA." *Miller v. Champion Enters.*, 346 F.3d 660, 690 (6th Cir. 2003). Plaintiffs did not move for leave to further amend their Amended Complaint in the event that the Court rules in Defendants' favor. Accordingly, its dismissal is with prejudice.

**IV.     CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 29) is **GRANTED**. Plaintiffs' Amended Complaint is **DISMISSED with prejudice**. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket record of the United States District Court for the Southern District of Ohio.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**